**TRUNCALE v. BLUMBERG et al.**

United States District Court
S. D. New York.
Oct. 14, 1948.

Millard & Greene, of New York City (Milton Pollack, of New York City, of counsel), for plaintiff.

H. G. Pickering of Mudge, Stern, Williams & Tucker, all of New York City (Robert E. Walsh, of New York City, of counsel), for defendant J. Cheever Cowdin.

Roger S. Foster, of Washington, D. C., Gen. Counsel for Securities and Exchange Commission, amicus curiae.

MEDINA, District Judge.

In this action by a stockholder of Universal Pictures Company, Inc., brought in the right and on behalf of the Company after non-compliance by the Company with plaintiff's statutory request that the action be brought by it pursuant to Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78p(b), to recover profits allegedly realized by certain officers and directors of the Company, from transactions involving the purchase and sale and /or sale and purchase of equity securities of the Company within periods of less than six months, the defendant J. Cheever Cowdin moves for summary judgment and the plaintiff has made a cross motion for similar relief. The facts are not in dispute but a number of questions of law are presented, some of which are important and are said to be of first impression.

On March 4, 1941 Cowdin entered into an employment contract with Universal Pictures Company, Inc., to act as Chairman of the Board and Chief Financial Executive for a period commencing on April 3, 1941 and ending on December 31, 1947. At that time Universal Pictures Company, Inc. was an operating company engaged in the production of motion pictures and Universal Corporation was the owner and holder of approximately 92% of the common stock of Universal Pictures Company, Inc. and all of the outstanding shares of second preferred stock of Universal

Pictures Company, Inc. Accordingly, concurrently with the execution of the employment contract Cowdin entered into a contract with Universal Corporation by which "in consideration * * * of the execution of the aforesaid employment agreement by the said Cowdin * * * and as an inducement for him so to do" Universal Corporation guaranteed the performance by Universal Pictures Company, Inc. of all the terms and conditions of the employment contract and, in addition, agreed to issue to Cowdin on December 31, 1941, and annually thereafter during his term of employment, warrants for the purchase of 5,000 shares of common stock, hereinafter referred to as 5,000 warrants. The agreement with Universal Corporation also provided:

"The best interests of the Corporation and its affiliates would be served if Cowdin's holdings of the Corporation's stock were materially increased because his personal ownership of a larger investment in the Corporation, or his right to purchase the same, would act as an incentive to him to make the Corporation's stock more valuable and would insure his loyalty to the welfare of the Corporation and its security holders."

In June 1943 Universal Pictures Company, Inc. was merged into Universal Corporation and, at the time of the merger, Universal Corporation changed its name to Universal Pictures Company, Inc. The surviving corporation, under the name of Universal Pictures Company, Inc., is the corporate defendant herein.

The 5,000 warrants were duly issued to Cowdin in December 1941, and annually thereafter as agreed. With reference to the periods involved in the present action, it will suffice to identify only the dates of December 12, 1945, December 16, 1946 and December 16, 1947 as the dates on which the 5,000 warrants were issued in each of those years.

Within the period relative to this action, that is to say, subsequent to January 23, 1945, Cowdin did not purchase, acquire or otherwise receive in any other way, directly or indirectly, any other warrants covering shares of common stock of the corporate defendant; nor did he purchase, acquire, or otherwise receive in any way, directly or indirectly, shares of common stock or other equity securities of the corporate defendant, other than the warrants above referred to; he did not exercise any of the warrants covering common stock of the corporate defendant; he did not sell any warrants nor did he sell any common stock or other equity securities of the corporate defendant.

The transactions which give rise to the controversy here were all gifts of warrants, received as aforesaid, these gifts being made, mostly in amounts ranging from fifteen to one hundred shares, but a few in amounts as large as 500 shares, to a great variety of charitable organizations such as the Los Angeles Community Chest, Roosevelt Hospital, New York Infirmary for Women and American Cancer Society. In every case the donees are indisputably bona fide religious, charitable or philanthropic institutions or oganizations. Cowdin is not shown to have any interest in or any control over any of these charities. The gifts were in every way bona fide, and completely divested Cowdin of any interest in the warrants thus transferred.

On the face of the matter it seems nothing short of absurd to consider these gifts as "sales" within the meaning of Section 16(b). The notion that gifts to charity might result in "profits" to the donor seems equally fanciful. Indeed, against the background of a statute designed to raise the standards of fiduciaries and thus protect the outside stockholders against short-swing speculation by insiders with advance information, Smolowe v. Delendo Corporation, 2 Cir., 1943, 136 F.2d 231, 235, 148 A.L.R. 300; Kogan v. Schulte, D.C.S.D.N.J.1945, 61 F.Supp. 604, it is hard to see any relation whatsoever between gifts to charities and trading for profit in the market place.

The argument is made, however, not only that the delivery of the warrants on the dates above referred to was a "purchase," but that the gifts to charity constituted "sales" for profit. Thus it is said that the Section covers not only a real sale or one which may substantially be viewed as such,

but that, by the definition of Section 3(a)(14), 15 U.S.C.A. § 78c(a) (14), any transaction by which an owner may sell "or otherwise dispose of" equity securities is a sale. The "profit" is established in a most ingenious manner. The gift to charity is characterized as a "tax dodge"; and it is pointed out that, by taking a deduction on his income tax return of the market value of the warrants at the time of the gift, the donor gains an economic benefit which is the equivalent of a profit.

In this case Cowdin did include these gifts in his tax returns as contributions to charity for which he claimed deductions, but counsel would not concede that it would make any difference even if, through inadvertence or for some other reason, deductions for charitable contributions had not been made. It is argued that there is "profit" none the less, apparently on the theory that any "economic advantage" which might have been taken by one skilled in the intricacies of the tax laws would serve as a sufficient "profit" under Section 16(b), whether or not the donor had availed himself thereof.

On the other hand, it is argued on behalf of Cowdin that there never was any "purchase" of the warrants as they were issued pursuant to the terms of a contract; that, even if a "purchase" be found, this must have been made at the time of the execution of the contract and not at the time of the delivery of the warrants; that the gifts could not constitute "sales" within the meaning of the statute; that there was no profit in any event; and that if the warrants be deemed to have been "purchased," they were within the exception which provides "unless such security was acquired in good faith in connection with a debt previously contracted," it being the view of counsel for Cowdin that the contract pursuant to which the warrants were issued constituted in substance a "debt."

A reading of Section 16(b) would scarcely warrant an inference that a gift would be regarded as a "sale" within the meaning of that Section. Nor does the definition contained in Section 3(a) (14) carry us much further. It is there stated:

"(14) The terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of."

The natural meaning to attribute to this language would seem to be that, for the purposes of Section 16(b), an executed sale would be included and also "any contract to * * * otherwise dispose of" the securities. Here there was no "sale" nor was there any contract "to otherwise dispose of" the warrants.

That all "acquisitions" are not "purchases" and all "disposals" not "sales," within the meaning of Section 16(b) seems demonstrable, and in accord with the definitions contained in Section 3(a) (13), 15 U.S.C.A. § 78c(a) (13) and Section 3(a) (14). When a person dies leaving a will in which the equity securities of an issuer are bequeathed, it is commonly said that he "disposes" of the property by the will, which takes effect upon his death. But this is not a "contract to dispose of" the securities; nor is it a sale. The statute does not state that a sale "means" any disposition whatever by the owner, as is the case with other definitions contained in Section 3(a). A "sale" is merely defined as including a "contract to sell or otherwise dispose of." The same reasoning would seem to apply to an "acquisition" by will or inheritance. There is no "purchase" by the legatee or next of kin (I am not using "purchase" in the technical sense of conveyancing, 2 Bl.Comm. *241; Co. Litt. *18, nor do I feel that the Congress intended to do so) nor is there any "contract * * * to otherwise acquire." There is no "sale" by the testator or the intestate nor is there any "contract to sell or otherwise dispose of."

But this does not mean that a "sale" and a "purchase" in the context of Section 16(b) are the same as a "sale" and a "purchase" as defined in other statutes relating to other subjects. In this particular context it seems clear that these terms must be given the broadest possible connotation, consistent with the fundamental meaning of the words "sale" and "purchase," which will best effectuate the express purpose of the statute to remove all incentive to insiders to profit on short-swing transactions

from confidential information available only to them because of their position of trust. Rubin & Feldman, Unfair Use of Corporate Information, 95 U.Pa.L.Rev. 468, 485 (1947). Doubtless it was the intention of the Congress that the terms of Section 16 (b) should cover any acquisition or disposal of the securities which might reasonably be considered in the category of a "purchase" or a "sale," in connection with which an insider might profit by the use of confidential information to the detriment of the outside stockholders and the corporation.

This is what I think was decided in the leading cases of Smolowe v. Delendo Corporation, 2 Cir., 1943, 136 F.2d 231, 148 A.L.R. 300, and Park & Tilford v. Schulte, 2 Cir., 1947, 160 F.2d 984. Nowhere in either of these cases is it said that every "acquisition" is a "purchase" and every "disposal" a "sale." On the contrary, in the Park & Tilford case, 160 F.2d at page 987, Judge Clark is most explicit. Referring to the conversion of the preferred stock into common stock in that case, he states:

"Therefore they acquired the stock, within the meaning of the Act. The Act certainly applies as well to executed acquisitions as to executory contracts to acquire."

Under the circumstances the conversion was held to constitute a "purchase" within the meaning of Section 16(b); and the Circuit Court so held because the facts in that case presented a situation which it was fair to say the statute was intended to cover. By no stretch of the imagination, however, can a gift to charity or indeed to anyone else when made in good faith and without pretense or subterfuge, be considered a sale or anything in the nature of a sale. It is the very antithesis of a sale; and there is no reason to suppose that the Congress intended the statute to apply to gifts.

The tax laws would seem to have absolutely nothing to do with the question. To describe these gifts to charity as a "tax dodge," seems nothing short of a gratuitous slur on a man whose benefactions cover such a wide field and so evidence a charitable disposition which the law should foster rather than condemn. In any event, the statute in question was designed to prevent short-swing speculation by corporate executives and insiders and no amount of tax dodging, even if it were present, could possibly be detrimental to the rights of the other security holders or to the corporation, so far as appears in this record.

In a companion motion in connection with which a dismissal of the action as to one of the defendants was granted on plaintiff's motion, urged upon the ground that only small amounts were involved and that the case presented "a very cloudy question" which would make it undesirable to prosecute the action on the corporation's behalf, there were involved gifts to the wife and children of the defendant Prutzman. I cannot see why a bona fide gift to a relative or employee or other object of the donor's bounty should be in any different category from a gift to charity. See Shaw v. Dreyfus, D.C., 79 F.Supp. 533, per Goddard, D. J. Of course, if it appears that shortly after the gift, and within the six months' period provided by Section 16(b) the wife or other donee sells the stock, the circumstances may disclose that the wife or other donee was in effect an alter ego of the officer or director or beneficial owner and that the sale was really made by him. It is at least theoretically possible to consider the same type of situation in the case of a gift to some so-called "charity." But we are concerned here with no subterfuge, artifice or ingenious scheme but with a series of genuine bona fide gifts to well accredited charitable and philanthropic organizations.

At my suggestion the SEC has filed a memorandum as amicus curiæ, which was received after the foregoing portion of this opinion had been drafted. The position is taken that the transactions do not come within Section 16(b) because there was no "profit realized by" Cowdin. It is pointed out, however, that a ruling that there was no "sale" might leave a loophole in the law in instances where the donee is a relative or person other than a charity, as the donee may effectuate a sale within the six months' period and it would be difficult to establish the mala fides of the gift. It is argued that the statute was designed to operate "irre-

spective of any intention on the part of the insider."

Two alternative theories are suggested. The first is to regard the transaction as a gift, but "to apply the equitable doctrine which treats the donee as standing in the shoes of the donor." On this theory the donor would be required to account for the profit and the date of the sale by the donee would control. The other theory would be to treat the gift as a sale. Under this theory the insider would be accountable even where the non-charitable donee still retained the securities or even had sold them subsequent to the date of the gift at a price below the donor's cost. The "profit" would be the amount of any market increment at the time of the gift.

But references in the cases to the operation of the statute irrespective of intention are plainly to the subject of intention to benefit by the use of inside information, see, e.g., Smolowe v. Delendo Corporation, 2 Cir., 1943, 136 F.2d 231, 235, 236, 148 A.L.R. 300, and the whole history of this legislation shows that the statutory scheme was deliberately designed to discourage short term speculation by insiders by eliminating the necessity of proof that there was an intentional and willful wrong by a profit-seeking fiduciary, unmindful of his duty. Hence no showing of an actual unfair use of inside information is required. The intention now under discussion is of a different sort. Whether a transaction is real or merely a device or artifice to avoid the impact of the statute must depend upon intention. By the application of familiar principles the transaction falls into one category or another depending upon the intention of the parties. The statute is applicable to sales, not to gifts. So to stretch the meaning of the words involved would make Section 16(b) a trap for the unwary and, it seems to me, would give it a meaning that never was intended.

Neither of the suggested theories will bear analysis. The difficulty with the first one is that if one is to consider the transaction a gift and not a sale, the statute affords no basis for any equitable or other doctrine which would treat the donee as standing in the shoes of the donor. On the other hand, to consider the transaction as a sale would require the construction of a merely theoretical "profit" in cases where the donee did not resell or resold at a loss. The distinction between a bona fide gift to charity and a bona fide gift to a relative, a corporate employee or a mere stranger amounts to no more than a synthetic discrimination, wholly without substance and contrary to the plain meaning of the statute. The very refinement of the reasoning which is required and the complications which present themselves on every side indicate that injustice would inevitably result.

I find that these gifts do not constitute "sales" and that there was no profit.

■■■ By the same process of reasoning it seems to me that some of the contentions of Cowdin must be rejected. We must seek the intent of the Congress by a careful scrutiny of the wording of the statute, considered against the background of the evils which the statute was designed to eradicate. The contract of March 4, 1941 did not in any real sense constitute a "debt"; nor can it be said that these warrants were "acquired in good faith in connection with a debt previously contracted." The language must be read not only in the sense which the words will naturally bear, but in the sense obviously intended by the statute when viewed as a whole. Here there was no "debt previously contracted."

The contract was doubtless a "contract to buy, purchase, or otherwise acquire" but the statute also includes any "purchase"; and the acquisition of these warrants by Cowdin at the time of their actual issuance to him, would seem to be an "acquisition" in the same sense as was the receipt of the common stock upon the conversion of the preferred in Park & Tilford v. Schulte, 2 Cir., 1947, 160 F.2d 984.

It is to be noted that, by reason of the conclusions arrived at as above stated, this case does not present for consideration the question of how profits, if any, are to be calculated should a director, officer or beneficial owner, who has received equity securities of an issuer pursuant to the terms of an employment contract or a contract such as that of the parent company here,

sell or contract to dispose of the securities within the six months' period provided by Section 16(b).

The motion of defendant Cowdin for summary judgment dismissing the complaint as to him is granted; and plaintiff's cross motion for summary judgment is denied.

Settle order on notice.