### BLAU et al. v. HODGKINSON et al.

United States District Court
S. D. New York.
Aug. 3, 1951.

Morris J. Levy, New York City, for plaintiff.

Cleary, Gottlieb, Friendly & Hamilton, New York City, (Henry J. Friendly, New York City, of counsel), for defendants.

Roger S. Foster, Gen. Counsel, Manuel F. Cohen, Special Counsel, Division of

Corp. Finance, Meyer Feldman, and Herbert Schick, all of Washington, D. C., for Securities and Exchange Commission as amicus curiae.

LEIBELL, District Judge.

Both plaintiff and defendants have moved for a summary judgment. Plaintiff's claim is based on § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78p(b).[1] The Securities and Exchange Commission has filed a brief amicus curiae.

The defendants' notice of motion under Rule 56 Fed.Rules Civ.Proc. 28 U.S.C.A. asks the Court:

"1. To enter summary judgment in favor of defendants Harold D. Hodgkinson, Fred Lazarus, Jr. and Jeffrey L. Lazarus dismissing the action on the ground that there is no genuine issue as to any material facts and that defendants are entitled to a summary judgment as a matter of law; or

"2. To enter summary judgment in favor of defendants Fred Lazarus, Jr. and Jeffrey L. Lazarus as set forth in paragraph 1 and, with respect to defendant Harold D. Hodgkinson, if the Court is not satisfied that said defendant is entitled to summary judgment with respect to asserted liability under Section 16(b) of the Securities Exchange Act of 1934 for profits arising out of the sale of 620 shares of the common stock of Federated Department Stores, Inc. (hereinafter referred to as 'Federated') within six months of his acquisition of common stock of Federated on January 13, 1949, by the exercise of stock warrants issued to him on October 2, 1944, (a) to enter summary judgment in favor of said defendant dismissing the action against him in so far as it relates to asserted liability arising under Section 16(b) of the Securities Exchange Act of 1934 for profits arising out of the sale of 100 shares of the common stock of Federated within six months of his acquisition on December 6, 1949, of common stock of Federated received by him as a stockholder of Wm. Filene's Sons Company upon his surrender of stock in said Wm. Filene's Sons Company in accordance with the Agreement and Plan of Reorganization between Federated and Wm. Filene's Sons Company dated November 7, 1949, on the ground that there is no genuine issue as to any material facts and that said defendant is entitled to summary judgment in regard to said transaction as a matter of law; and (b) with respect to the transaction first above referred to, to enter summary judgment determining the said defendant's liability to be limited to $1,820.09 by Rule X–16B–6 of the Securities Exchange Commission."

The plaintiff's cross motion prays: "* * * for an order pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting a summary judgment in favor of

1. Section 16(b) of the Securities Exchange Act of 1934 provides: "For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

the plaintiff and against the defendants upon the ground that, except as to the amount of damages, there is no genuine issue as to any material fact and that plaintiff is entitled to a judgment as a matter of law, and that plaintiff have such other and different relief as to the Court may seem just and proper, including a reasonable fee for plaintiff's attorney."

The affidavit of plaintiff's attorney states: "The defendants' moving papers detail with great particularity all of the material facts involved herein. The sole issue, therefore, is the legal effect of these facts with respect to the liability of the individual defendants under Section 16(b) of the Securities Exchange Act of 1934."

Therefore we can look to the affidavits submitted by the defendant for a detailed statement of the facts, which are somewhat involved although not disputed.

The affidavit of Mr. Lebor, treasurer of Federated Department Stores, Inc., to which are annexed a number of exhibits points up the issues and also contains important particulars relevant to the issues. I quote from it at some length as follows:

"This action involves two different types of claims:

"The first relates only to Mr. Harold D. Hodgkinson. It involves his acquisition, on January 13, 1949, of 3400 shares of common stock of Federated through the exercise of a Warrant Certificate which he had held since October 2, 1944, and his sale within a period of six months before or after January 13, 1949, of 620 shares of the common stock of Federated. This claim raises a question as to the amount of 'profit' realized by Mr. Hodgkinson and, in this connection, as to the valuation of the shares acquired by Mr. Hodgkinson on January 13, 1949, and also as to the effect of a settlement made between Mr. Hodgkinson and Federated in July, 1950.

"The second claim relates to transactions of all three defendants. Late in 1949 Federated and its principal subsidiaries carried out a plan of corporate simplification. This plan had been under consideration for several years. It involved the purchase by Federated of the assets of the subsidiaries, in consideration of the issuance to the subsidiaries of common stock of Federated and the assumption by Federated of the liabilities of the subsidiaries. The subsidiaries thereupon distributed to their stockholders, upon surrender of the latter's stock in the subsidiaries, the stock of Federated which the subsidiaries had received. Each of the three defendants held a small amount of stock in one or more of these subsidiaries. Each of them sold common stock of Federated within six months of their receipt of common stock of Federated as a result of the liquidation of the subsidiaries. This claim raises the question whether defendants made a 'purchase' of the stock of Federated received by them upon their surrender of stock in the subsidiaries.

"I propose to set forth in this affidavit the pertinent facts as to these matters which appear in the records of the corporation or are otherwise known to me.

"I. *The Transaction Arising out of Mr. Hodgkinson's 1949 Exercise of Warrants Acquired by Him in 1944.*

"The Board of Directors of Federated on June 25, 1940, adopted resolutions recommending that the stockholders authorize the Board of Directors to put into effect a Plan for Issuing Warrants for the Purchase of, or Conversion into, Common stock of Federated to Certain Executives of Subsidiaries of Federated (hereinafter referred to as the 'Warrant Plan'). This Warrant Plan was approved by the stockholders of Federated at a special meeting held August 29, 1940.

\* \* \* \* \* \*

"Each warrant was to authorize the holder to purchase one share of common stock of Federated, on or before May 1 of the fifth year after the calendar year in which the warrant was originally issued, at a price equivalent to the average closing price or bid price for the stock for the ten trading days prior to the first day of the calendar month as of which such warrant was originally issued. If the warrant was not exercised, it could be converted, without payment, into one-tenth of a share of common stock of Federated at any time

before it expired, but only after two years from its original issue date. This right of conversion was exercisable only while the warrant remained in the possession of the original recipient who was still in the employ of one of the subsidiaries of Federated unless this requirement of employment at the time of conversion was waived by Federated.

\* \* \* \* \* \*

"On September 26, 1940, the Board of Directors of Federated adopted the Warrant Plan which had been approved by the stockholders at their special meeting on August 29, 1940, and authorized the issuance of 25,000 warrants for the year 1940 for distribution among major executives of the four principal subsidiaries above named and of their subsidiaries. 10,000 warrants were divided among the four principal subsidiaries equally, and 15,000 warrants were distributed among said subsidiaries in proportion to their earnings. Similar action was taken by Federated Board of Directors in each of the years 1941-1944, inclusive, except that in these years 8,000 warrants were divided among the four subsidiaries equally and 17,000 warrants were distributed in proportion to the subsidiaries' earnings.

"On June 25, 1941, the Board of Directors of Federated adopted resolutions recommending to the stockholders certain amendments of the Warrant Plan. The most important of these amendments was as follows: The Plan adopted in 1940 had provided that 'No Warrant Certificate may be transferred except as a whole; nor until after the expiration of one year from its original issue date'; and had also provided that the warrants were to 'contain such provisions as your Board of Directors determines insuring that the acquisition thereof or of shares thereunder is for the purpose of investment and that the holder does not intend redistribution thereof.' The directors recommended the striking out of the latter provision and the substitution for the former of a provision reading as follows: 'No Warrant Certificate may be transferred until after the expiration of one year from the date as of which it is originally issued.' These amendments were approved by the stockholders at a special meeting held on July 23, 1941.

"The common stock of Federated issuable upon the exercise of the warrants was listed on the New York Stock Exchange and was registered under the Securities Exchange Act of 1934 [15 U.S.C.A. § 78a et seq.]. Both the warrants and the common stock issuable upon the exercise thereof were registered with the Securities and Exchange Commission under the Securities Act of 1933 [15 U.S.C.A. § 77a et seq.]. The prospectus dated September 6, 1943, which included warrants of the Series issued to Mr. Hodgkinson on October 2, 1944, stated that the consideration for such warrants 'Will be services of certain executives of subsidiaries of Federated to the subsidiaries.' \* \* \*

\* \* \* \* \* \*

"In each of the five years during which the Warrant Plan was in effect, Mr. Hodgkinson was one of the executives to whom warrants were issued pursuant to authority conferred by Federated's Board of Directors. During the life of the plan there were issued to Mr. Hodgkinson, out of warrants which had been allocated to Filene's, Warrant Certificates as follows:

| "Series | Date of Actual issue | No. of Warrants (before split-up) | Exercise Price (before split-up) |
|---|---|---|---|
| 1940 | 9-2-40 | 3,000 | $18.7125 |
| 1941 | 5-1-41 | 2,500 | 19.1375 |
| 1942 | 5-1-42 | 2,500 | 12.275 |
| 1943 | 1-27-44 | 1,500 | 19.825 |
| 1944 | 10-2-44 | 1,700 | 23.075 |

\* \* \* \* \* \* \* \* \* \* \*

"In 1946 Federated reclassified its stock so that two shares of stock were issued for each share theretofore outstanding. Thereafter, the Warrant Certificate issued to Mr. Hodgkinson on October 2, 1944, entitled him to purchase 3400 shares of the common stock of Federated on or before May 1, 1949, at 11.5375 per share.

"On January 13, 1949, Mr. Hodgkinson exercised and surrendered the Warrant Certificate he had received on October 2, 1944, and purchased 3400 shares of Federated common stock at the exercise price of $11.5375 per share. A copy of Mr. Hodgkinson's letter of transmittal is annexed hereto marked Exhibit D and made a part hereof. On this date the market value of Federated common stock was $27 per share.

"Within six months of January 13, 1949, Mr. Hodgkinson made the following sales of Federated common stock:

| "Date | No. of Shares Sold | Price per Share |
|---|---|---|
| Oct. 22, 1948 | 340 | $27.44 |
| June 23-24, 1949 | 280 | 27.43 |

\*      \*      \*      \*      \*      \*

"Communications were had during the spring and early summer of 1950 between Federated and Mr. Hodgkinson and their attorneys as to whether Mr. Hodgkinson was liable to Federated under Section 16(b) of the Securities Exchange Act for profits arising out of these sales and, if so, for how much.

"On April 29, 1950, Messrs. Nutter, McClennen & Fish, 75 Federal Street, Boston 10, Massachusetts, attorneys for Mr. Hodgkinson, addressed a letter to me stating that in their opinion the sales of stock by Mr. Hodgkinson did not give rise to any liability under Section 16(b).

"However, on July 3, 1950, I addressed a letter to Mr. Hodgkinson stating that Federated had been advised by counsel that Mr. Hodgkinson was liable to Federated under Section 16(b) of the Securities Exchange Act of 1934 in the sum of $890.09 and requested payment from him in that amount. The sum was determined as follows:

"Mr. Hodgkinson had realized from his sales of 280 and 340 shares of Federated common stock in October, 1948 and June, 1949 an aggregate of $17,010.09. The cost to him of an equivalent number of shares which he acquired on January 13, 1949, consisted of $7,153.25 in cash and the surrender of 310 warrants entitling him to purchase 620 shares of Federated common stock at $11.5375 per share. Since the market value of Federated common stock on January 13, 1949, was $27 per share, it would appear that the market value of each warrant (valid until May 1, 1949) to purchase a share at $11.5375 would be at least $15.4625, or a total of $9,586.75 for 310 warrants. However, Federated had been advised by A. G. Becker & Co., a Chicago investment house which had handled a number of sales of Federated warrants, that in a number of cases the sales price of a warrant had been the difference between the market price of Federated common stock on the day of sale and the exercise price of the warrant, less a discount in cases where a large number of shares were involved. They had further advised that in January, 1949, the maximum such discount would have been $1 for each share of stock on a block of warrants as large as that held by Mr. Hodgkinson, although if only a few hundred shares of stock were involved there would probably have been no discount. The Company therefore calculated the market value of each warrant at $28.925, or $8,966.75 for the 310 warrants surrendered by Mr. Hodgkinson to acquire 620 shares. This resulted in a total cost of $16,120.00 for 620 shares.

"Mr. Hodgkinson's attorneys were of the view that since Mr. Hodgkinson's liability under Section 16(b) related only to 620 shares of Federated common stock, and not to the entire 3400 shares purchased by him on January 13, 1949, no discount should have been applied in determining the value of the warrants surrendered by Mr. Hodgkinson on January 13, 1949. On this view the cost of the 620 shares would have been $16,740 and the profit $270.09. However, on July 10, 1950, Mr. Hodgkinson paid to

Federated the entire amount asserted by it, this payment being in satisfaction of the Corporation's claim:

"On October 30, 1950, the Securities and Exchange Commission promulgated Rule X–16B–6. Under this Rule Mr. Hodgkinson's maximum liability would be $1820.09, determined as follows:

"The lowest market price of Federated common stock in the period from six months prior to six months after Mr. Hodgkinson's sale of 340 shares on October 22, 1948, for $9,329.31 was 24½ on March 7, 1949, and March 23, 1949. The lowest market price of Federated common stock in the period from six months prior to six months after Mr. Hodgkinson's sales of 280 shares of Federated common stock on June 23 and 24, 1949, for a total of $7,680.78 was 24½ on March 7 and 23, 1949. Accordingly, the maximum liability of Mr. Hodgkinson under Rule X–16B–6 of the Securities and Exchange Commission would be $999.31 on the former transaction and $820.78 on the latter, for a total of $1820.09.

"II. *The Transactions Involving the Distribution of Federated Common Stock by Subsidiaries of Federated to the Defendants upon the Surrender of Their Stock in the Subsidiaries Incident to the Liquidation of the Latter.*

"Prior to the corporate reorganization and simplification which was carried out at the end of 1949, Federated was primarily a holding company owning directly or indirectly securities of corporations engaged generally in the operation of department and specialty stores. Federated's major subsidiaries were Abraham & Straus, Bloomingdale, Filene's and Lazarus. Since its organization in 1929, Federated had acquired additional shares of its subsidiaries' stock, principally through exchange, so that prior to the corporate reorganization and simplification, it owned all of the subsidiaries' preferred stocks and 91.49% of Abraham & Straus common shares, 92.72% of Bloomingdale common shares, 99.21% of Filene's common shares, and 99.30% of Lazarus common shares.

"For several years the Board of Directors of Federated had had under consideration a program for simplifying the corporate structure of Federated whereby Federated would acquire the assets of these subsidiaries. The purposes of this corporate simplification program were, as later set forth in the Proxy Statement dated May 5, 1949, to achieve 'increased efficiency in the conduct of the Corporation's finances, including reduced working capital and interest requirements, improved standing for the Corporation's stock as the stock of an operating company and substantial expense savings, including tax savings through eliminating inter-corporate dividend taxes on the earnings received by the Corporation from its subsidiaries.' Early in 1947 counsel had been asked to make a further study of this subject of corporate simplification. A report on this study was submitted to the Board of Directors on July 26, 1947, and was discussed by them at their next meeting. In February, 1948, I prepared a memorandum summarizing the study of July 26, 1947, in order to facilitate discussion and decision on basic policy at the March 4, 1948, director's meeting.

\*   \*   \*   \*   \*   \*

"On April 13, 1949, the Board of Directors authorized the officers of Federated to proceed with carrying out the program, subject to the receipt of favorable tax rulings and closing agreements. The Board also recommended that an amendment be made to Federated's Agreement of Consolidation increasing the number of authorized shares of common stock from 4,000,000 to 7,000,000 in order to put Federated in a position to carry out the acquisition of the assets of the subsidiaries. This proposal was included in the notice of the annual Federated stockholders meeting that was sent out on May 5, 1949. \*   \*   \*

\*   \*   \*   \*   \*   \*

"Time schedules were prepared with a view to consummating the reorganization by the end of 1949 or early in 1950. Although most of the details had been worked out, formal corporate action to carry out the Plan was deferred because of the delay in obtaining favorable tax rulings from the Bureau of Internal Revenue.

\*   \*   \*   \*   \*   \*

"The annual Federated stockholders meeting which had been originally called

for June 7, 1949, and had subsequently been adjourned from time to time pending receipt of satisfactory tax rulings relative to the tax effect of the proposed reorganization, was held on September 30, 1949. At this meeting the stockholders approved the increase in the authorized capital stock of the corporation from 4,000,000 to 7,000,000 shares. Thereupon, Federated advised its subsidiaries that the condition of its offer of September 26, 1949, was removed. On September 30, 1949, the Federated Board of Directors authorized the execution and delivery of closing agreements with the Commissioner of Internal Revenue.

"Each of the subsidiaries thereupon accepted the offer of Federated subject to approval of stockholders of these subsidiaries. Meetings of such stockholders were duly called. Attached hereto marked Exhibits E, F and G and made a part hereof, are copies of the notices of meeting of Filene's, Bloomingdale, and Lazarus, each of which included the form of Agreement and Plan of Reorganization with respect to the acquisition by Federated of the assets of the company in question.

"The Agreement and Plan of Reorganization between Federated and Filene's was approved by the latter's stockholders and executed on November 7, 1949, the Agreement and Plan of Reorganization between Federated and Bloomingdale on November 9, 1949, and the Agreement and Plan of Reorganization between Federated and Lazarus on November 14, 1949. Each Agreement and Plan of Reorganization involved the following material features:

"1. The transfer by the subsidiary of all of· its assets to Federated in exchange for shares of common stock of Federated in the amounts set forth below and the assumption by Federated of the subsidiary's liabilities:

| "Number of Shares of Federated Common | Subsidiary |
| --- | --- |
| 621,265 | Abraham & Straus |
| 511,182 | Bloomingdale |
| 625,000 | Filene's |
| 982,003 | Lazarus |

"2. The liquidation of the subsidiary and the distribution to its stockholders of the Federated common stock received by the subsidiary in exchange for its assets, upon the following basis:

| "Number of Shares of Federated Common | Number of Shares of Subsidiary's Stock |
| --- | --- |
| | Abraham & Straus |
| 3.25 shares | for one share of no par common stock |
| | Bloomingdale |
| 1.5 shares | for one share of no par common stock |
| | Filene's |
| 1.25 shares | for one share of no par common stock |
| | Lazarus |
| 2.5 shares | for one share of no par common stock |

"3. In the event of a failure or refusal of a stockholder of a subsidiary to surrender his stock certificate: '* * * In the event that any stockholder of [the subsidiary] who is entitled to surrender his stock in [the subsidiary] shall not have surrendered such stock in [the subsidiary] for shares of the Common Stock of Federated as hereinabove provided, then said shares of said stock in [the subsidiary] will, nonetheless, be deemed surrendered and will be deemed cancelled. The distributive shares of Federated stock allocable to such non-exchanging stock, will be held in the name of or for the account of such stockholder by the Disbursing Agent or by Federated, as the latter may determine, and distributed to such stockholder on request, without interest, upon surrender of the certificates of stock of [the subsidiary] held by him.'

"4. In the event that stockholders of a subsidiary should vote against the transfer and demand payment in cash in accordance with applicable State law, the subsidiary was to retain an amount of cash sufficient to meet such demands and to return to Federated the Federated stock that would otherwise have been issuable to such dissenters.

"Each Agreement and Plan of Reorganization fixed a closing date. In the case of Lazarus and Filene's, this date was November 26, 1949, and in the case of Bloomingdale, December 31, 1949. On the respective closing dates, each subsidiary transferred all its assets, except cash retained for dissenting shareholders' claims and miscellaneous expenses, to Federated, which formally assumed all the subsidiary's liabilities. On the same date, Federated

delivered to The Central Hanover Bank and Trust Company, the custodian previously designated by each subsidiary to receive the stock, a certificate for the agreed number of shares of Federated common stock. Each subsidiary authorized the Central Hanover to transfer the shares represented by the certificate to its common and preferred stockholders on the basis provided in the Plan and to distribute certificates for such shares to the various stockholders upon surrender for cancellation of their certificates for subsidiary stock. The various stockholders of Lazarus, Filene's and Bloomingdale thereupon surrendered their certificates for shares in the subsidiaries and received certificates registered in their respective names for the proper number of Federated shares. The subsidiaries have subsequently been dissolved.

"Among the stockholders of the subsidiaries who, pursuant to the Plan of Reorganization, surrendered stock in the subsidiaries and were issued Federated common stock were Messrs. Harold D. Hodgkinson, Fred Lazarus, Jr., and Jeffrey L. Lazarus. The number of shares of stock of subsidiaries surrendered, and the number of shares of Federated common stock received, by these three individuals were as follows:

| "Name | Number of Shares of Common Stock of Subsidiaries Surrendered | Number of Shares of Federated Common Stock Received | Date Federated Stock Received |
|---|---|---|---|
| Harold D. Hodgkinson | 110 Filene's | 138 | Dec. 6, 1949 |
| Fred Lazarus, Jr. | 192 Lazarus | 480 | Dec. 5, 1949 |
|  | 200 Bloomingdale | 300 | Jan. 3, 1950 |
| Jeffrey Lazarus | 151 Lazarus | 378 | Dec. 5, 1949 |
|  | 200 Bloomingdale | 300 | Jan. 10, 1950." |

The affidavit of Mr. Hodgkinson is in accord with Mr. Lebor's affidavit, in stating the circumstances under which he acquired the 1700 warrants, and adds: "When I received the last mentioned warrants on October 2, 1944, I was under a contract of employment with Filene's for a period commencing June 1, 1944 and ending December 31, 1949, a copy of which is attached as Exhibit B to the affidavit of Mr. John F. Lebor herein. When I entered into the said contract of employment, I, of course, knew of the existence of the Warrant Plan. I had received warrants of each of the four series which had theretofore been issued pursuant to the plan, and I expected to receive warrants of the 1944 series." Mr. Hodgkinson also refers to the circumstances under which he paid $890.09 in settlement of the corporation's claim under § 16(b). He states:

"On July 3, 1950, I received a letter from Federated informing me that they considered me liable to Federated in the sum of $890.09 under the provisions of Section 16(b) of the Securities Exchange Act of 1934, for profits arising from my sales of Federated common stock on October 22, 1948, and on June 23–24, 1949, and requesting payment of this amount.

"My attorneys had advised me that I had no such liability and that in any event my liability was less than the $890.09 demanded by Federated. They also advised me that they had so informed Federated. My attorneys further advised me that in order to settle the controversy they had informed Federated that they were advising me to make the payment demanded by Federated although it was a larger sum than what I conceded to be due. Accordingly, to avoid further discussion and controversy, I paid Federated $890.09 on July 10, 1950, in full satisfaction of my liability under Section 16(b) of the Securities Exchange Act of 1934 for profits arising from my sales of Federated common stock on October 22, 1948 and June 23–24, 1949."

An affidavit of F. Lazarus, Jr., discusses his acquisition, and subsequent sale, of Federated stock which he received under the corporate simplification of Federated and its subsidiaries, as described in the affidavit of Mr. Lebor. Mr. F. Lazarus, Jr., states:

"Pursuant to the liquidation of Bloomingdale as part of the corporate reorganization and simplification of Federated and its subsidiaries, I received from Bloomingdale on January 3, 1950, 300 shares of Federated common stock upon the surrender of my 200 shares of Bloomingdale common stock which I had acquired in 1942.

"Pursuant to the liquidation of Lazarus as part of the corporate reorganization and simplification of Federated and its subsidiaries, I received from Lazarus on December 5, 1949, 480 shares of Federated stock upon the surrender of my 192 shares of Lazarus common stock, which I had acquired prior to March 1, 1944.

"Between December 2, 1949, and May 17, 1950, I sold 3,000 shares of the common stock of Federated as follows:

| "Date | Number of Shares | Net Proceeds |
|---|---|---|
| 1949 | | |
| Dec. 2 | 500 | $16,345.12 |
| Dec. 6 | 500 | 16,842.61 |
| Dec. 7 | 100 | 3,418.03 |
| Dec. 8 | 400 | 13,673.32 |
| 1950 | | |
| April 13 | 100 | 3,716.52 |
| May 1 | 200 | 7,433.35 |
| May 2 | 200 | 7,433.34 |
| May 12 | 500 | 18,832.57 |
| May 16 | 200 | 7,632.34 |
| May 17 | 300 | 11,448.66" |

An affidavit of J. L. Lazarus, concerning similar transactions, states:

"Pursuant to the liquidation of Bloomingdale as part of the corporate reorganization and simplification of Federated and its subsidiaries, I received from Bloomingdale on January 10, 1950, 300 shares of Federated common stock upon the surrender of my 200 shares of Bloomingdale stock which I had acquired in 1942.

"Pursuant to the liquidation of Lazarus as part of the corporate reorganization and simplification of Federated and its subsidiaries, I received from Lazarus on December 5, 1949, 378 shares of Federated stock upon the surrender of my 151 shares of Lazarus stock, which I had acquired prior to 1932.

"Between May 23, 1950 and June 12, 1950, I sold 1277½ shares of the common stock of Federated as follows:

| "Date | Number of Shares | Net Proceeds |
|---|---|---|
| 1950 | | |
| May 23 | 900 | $34,235.39 |
| June 12 | 377-1/2 | 14,677.13" |

After a consideration of the relevant provisions of the statute, and of the rules of the SEC, and of the decisions of the courts interpreting the statute, I have concluded: (1) that the payment by defendant Hodgkinson of $890.09 in settlement of the corporation's claims under § 16(b) of the Securities Exchange Act of 1934 is not a defense to this action, but that the amount thus paid should be credited against the sum of $1820.09 for which Hodgkinson is liable under an application of Rule X–16B–6 [2] of the Securities and Exchange Commission to the transactions in relation to the stock obtained on the warrant of Federated; (2) that the SEC had the power to make the rule retroactive in

2. Rule X–16B–6 provides:

"(a) To the extent specified in paragraph (b) of this rule the Commission hereby exempts as not comprehended within the purposes of Section 16(b) of the Act any transaction or transactions involving the purchase and sale or sale and purchase of any equity security where such purchase is pursuant to the exercise of an option or similar right either (1) acquired more than six months before its exercise, or (2) acquired pursuant to the terms of an employment contract entered into more than six months before its exercise.

"(b) In respect of transactions specified in paragraph (a) the profits inuring to the issuer shall not exceed the difference between the proceeds of sale and the lowest market price of any security

its application; and (3) that the acquisition by the individual defendants of Federated stock, in connection with the plan for the corporate simplification of Federated and its four principal subsidiaries, constituted a "purchase" of the Federated stock, within the meaning and intent of § 16(b) of the Act.

The plaintiff contends that the profit of Hodgkinson or the sale of part of Federated stock received for the warrants was $9,856.84. The defendant Hodgkinson contends that the profits he derived on these sales amounted to $890.09, which he has paid to the corporation in settlement of its claims. The SEC argues that the profits for which Hodgkinson is liable on the sale of Federated stock received for the warrants, is $1820.09, under the application of its Rule X–16B–6. If the SEC had the power to make that rule retroactive, it covered the transaction in relation to the Federated stock received from the warrants. I believe that the SEC did have the power to make the rule retroactive and that the decision of the Supreme Court in a somewhat analogous situation involving another government agency (Administrator of F.L.S.A.) in Addison v. Holly Hill Fruit Products, Inc., 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488 is in point.

■ Defendant Hodgkinson contends that the payment by him of $890 in July 1950 was a full settlement of his liabilities resulting under § 16(b) of the Act. I believe that where there is a large spread beween the amount of the settlement and the amount actually due and if the settlor receives credit, as he should, for the amount he paid against the amount a court may find to have been due in a suit by a stockholder under § 16(b), that is all he is entitled to.

Under Rule 23(c), F.R.Civ.Pro., a suit under § 16(b), where the suit is brought by a stockholder, may not be compromised unless the provisions of the rule as to notice, a hearing and the like, are followed, or are waived by the court because of special circumstances. Pottish v. Divak, D.C., 71 F.Supp. 737. Where the settlement is made with the corporation direct, although formal approval of the court is not required under Rule 23(c) because the corporation's suit is not a class action, the settlor must run the risk of any very detrimental "mistakes" made in determining the amount of his liability.

■ Where, as here, a director's or insider's liability is clear and the amount of the liability is a matter of calculation by following the methods defined by our appellate court, it would be against public policy to sustain a settlement of $890. for a liability which at the time (July 1950), according to plaintiff's calculations amounted to about ten times the amount of the settlement (Rule X–16B–6 not being in effect at the time). The settlement of July 1950, is, therefore, no defense to plaintiff's suit against Hodgkinson.

Rule X–16B–6 adopted by the SEC to be applied to transactions under Sec. 16(b) of the Act, is a proper exercise of the Rule making power expressly conferred on the Commission by that subsection of the Act. The subsection provides: "This subsection shall not be construed to cover any transactions * * * which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection." Paragraph (a) of the Rule specifies certain types of transactions and paragraph (b) specifies that the profits inuring to the issuer in such specified cases

of the same class within six months before or after the date of sale. Nothing in this rule shall be deemed to enlarge the amount of profit which would inure to the issuer in the absence of this rule.

"(c) The exemptions provided by this rule shall not apply to any transaction made unlawful by Section 16(b) of the Act or by any rules and regulations thereunder.

"(d) The burden of establishing mar-

ket price of a security for the purpose of this rule shall rest upon the person claiming the exemption.

"(e) The exemption granted pursuant to this rule shall apply to any liability under Section 16(b) existing at or after the effective date of this rule, but shall not be deemed to effect judgments rendered prior to that date.

"This rule shall be effective November 29, 1950."

"shall not exceed the difference between the proceeds of sale and the lowest market price of any security of the same class within six months before or after the date of sale". Paragraph (e) of the Rules makes the Rule retroactive, but provides, of course, that it "shall not be deemed to affect judgments rendered prior to" the effective date of the Rule. The Rule became effective November 29, 1950; the transactions involved in this litigation occurred many months prior to that date. Plaintiff's attorney argues that, at least as to the retroactive provision of the Rule, it is unconstitutional in that it would destroy a right of action or claim already existing and created under the statute.

But it seems to be, in effect, what the Supreme Court told the Administrator of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. to do in Addison v. Holly Hill Fruit Products, Inc., supra. In that case the Administrator had defined "area of production" [322 U.S. 607, 64 S.Ct. 1217.] in relation to certain exemptions from the Act, one of which related to employment in agriculture and a related provision applied to workers engaged in processes for the marketing of agricultural products and employed "within the 'area of production'" of such commodities. In disposing of the case the Court stated "It is our view that the case should be remanded to the district court with instructions to hold it until the Administrator, by making a valid determination of the area with all deliberate speed, acts within the authority given him by Congress". Concerning the retroactive effect of the Administrator's ruling or definition the court stated, 322 U.S. at pages 620 and 622, 64 S.Ct. at pages 1222 and 1223:

"The accommodation that we are making assumes, what we must assume, that the Administrator will retrospectively act as conscientiously within the bounds of the power given him by Congress as he would have done initially had he limited himself to his authority. To be sure this will be a retrospective judgment, and law should avoid retroactivity as much as possible. But other possible dispositions likewise involve retroactivity, with the added mischief of producing a result contrary to the statutory design.

\* \* \* \* \* \*

"Finally, there is no difficulty upon such a remand in requiring the Administrator to promulgate his definition. This Court has on several occasions required the Interstate Commerce Commission to take jurisdiction when it declined to do so or to discharge a duty laid upon the Commission by statute. Interstate Commerce Commission v. United States of America ex rel. Humboldt Steamship Co., 224 U.S. 474, 32 S.Ct. 556, 56 L.Ed. 849; Louisville Cement Co. v. Interstate Commerce Commission, 246 U.S. 638, 38 S.Ct. 408, 62 L.Ed. 914. See also Kansas City Southern Ry. Co. v. Interstate Commerce Commission, 252 U.S. 178, 40 S.Ct. 187, 64 L.Ed. 517. The district court would not be telling the Administrator how to exercise his discretion but would merely require him to exercise it."

█ If that could be done in the midst of a litigation, in fact after a judgment of the district court for the complainant had been appealed and reversed by the Fifth Circuit Court of Appeals, 136 F.2d 323 why could not the Commission make its rule retroactive as to certain specified transactions under Sec. 16(b). In a dissenting opinion in the Addison case Mr. Justice Rutledge protested against the "novel disposition" his court made of the case and declared it an unauthorized practice "of retroactive administrative determination of private rights", and that "Retroactivity is not favored in law". But the holding of the majority opinion is the law, and under the principles therein declared and the directions embodied therein, I believe that the action of the Commission in making Rule 16–B(6) retroactive is constitutional. If Congress gave the Commission the power, by proper regulations, to exempt transactions altogether from the application of Sec. 16(b) of the statute, that grant of power would include the right to fix a limited exemption by adopting a rule for the determination of the amount of the "profit", under certain circumstances.

In its brief submitted "amicus curiae" the Commission refers to the "release"

which it published at the time the Rule was promulgated, as showing that if no retroactive provisions had been included in the Rule it would have resulted "in unduly harsh consequences". The retroactive aspect of the rule was attacked in Steinberg v. Sharpe, decided by Judge Medina, D.C., 95 F.Supp. 32, 34, but he found that there was no need for him to consider whether the rule "may properly be applied retroactively in this case". On appeal, his decision was affirmed "on opinion below" on June 25, 1951. 2 Cir., 190 F.2d 82. The rule was not an issue in Truncale v. Blumberg, which was decided by Judge Rifkind in January 1950, D.C., 88 F.Supp. 677, some months before the rule became effective. The case of Gratz v. Claughton, 2 Cir., 187 F.2d 46, did not involve Rule X–16B–6. There the appeal from the judgment was argued January 5, 1951. The judgment must have been obtained before November 29, 1950, the effective date of the Rule. The "crushing liabilities" in that case (over $300,000) may have had something to do with the adoption of the Rule, but that is only an assumption.

The acquisition by the defendants of stock of Federated under the plan of simplification for Federated and its subsidiaries is a "purchase" under Sec. 16(b) of the Act. Sec. 3(a)(13) of the Act defines "purchase" to "include any contract to buy, purchase, or otherwise acquire". Under the plan for the corporate simplification, a stockholder of one of the subsidiaries was not obliged to accept stock of Federated for his stock in the subsidiary. He could have demanded the cash value of his stock in the subsidiary based on the value of the assets transferred by the subsidiary to Federated less the obligations the subsidiary assumed by Federated. When the defendants turned over their stock in a subsidiary and received stock in Federated, they received something totally different from that which they surrendered—stock in a different corporation (Federated) with assets acquired from all four subsidiaries subject to the liabilities of all four subsidiaries. In surrendering his stock in the subsidiary the stockholder adopted for himself that part of the contract

between Federated and the subsidiary under which the stock of Federated was made available for exchange for the stock of the subsidiary. It can properly be held that the defendants acquisition was under and by way of a contract and through the exercise of rights resulting from that contract. The following quotation from Judge Clarke's opinion in Park & Tilford, Inc., v. Schulte, 2 Cir., 160 F.2d 984, at page 987, is pertinent: "We think a conversion of preferred into common stock followed by a sale within six months is a 'purchase and sale' within the statutory language of § 16(b). Whatever doubt might otherwise exist as to whether a conversion is a 'purchase' is dispelled by definition of 'purchase' to include 'any contract to buy, purchase, or otherwise acquire.' § 3(a)(13). Defendants did not own the common stock in question before they exercised their option to convert; they did afterward. Therefore they acquired the stock, within the meaning of the Act. The Act certainly applies as well to executed acquisitions as to executory contracts to acquire. Not otherwise could the Act accomplish the Congressional purpose to protect the outside stockholders against at least short-swing speculation by insiders with advance information. Smolowe v. Delendo Corporation, supra, 2 Cir., 136 F.2d 231, 235, 148 A.L.R. 300; Kogan v. Schulte, D.C. S.D.N.Y., 61 F.Supp. 604."

The case of Shaw v. Dreyfus, 2 Cir., 172 F.2d 140, 143, is not to the contrary and does not contain a factual situation similar to the situation in the case at bar. In that case it was held that the acquisition of stock, by the exercise of rights under warrants received by the defendant as a stockholder, was a "purchase", and that since the stockholder made a bona fide gift of part of the stock thus acquired, and since neither he nor the donee made any sale within the six months period of the exercise of the warrant rights by the donor, there was no purchase and sale such as is contemplated by the Act, and no claim arose under § 16(b). The gift of the stock did not fall within the definition of a "sale"— a contract to sell or "otherwise dispose of" a security; and the defendant Dreyfus in that case "realized no profit by making the

gifts." In the case at bar Hodgkinson purchased. Federated stock when he exercised his rights under the warrants he had received as described in Mr. Lebor's affidavit.

■ There is no dispute as to the amount due the corporation from Hodgkinson, under his Federated stock transactions in connection with the warrants, if Rule X–16B–6 is applied. The amount is $1820.09 and plaintiff is entitled to a summary judgment directing the payment of that sum by Harold D. Hodgkinson to Federated Department Stores, Inc.

■ The parties to this litigation should be able to calculate and agree upon the profits derived by each of the defendants as a result of their acquisition, and subsequent sale, of Federated stock in connection with the corporate simplification of Federated and its subsidiaries. If the parties cannot so agree, the court will name a special master to hear testimony on that issue and determine the amount due the corporation on those transactions, under § 16(b) as interpreted and applied by the United States Court of Appeals, Second Circuit, in Smolowe v. Delendo Corp., 136 F.2d 231, at pages 237–238, 148 A.L.R. 300 and Gratz v. Claughton, 2 Cir., 187 F.2d 46, at pages 51–52.

Summary judgment in favor of the plaintiff is granted to the extent hereinabove indicated. Settle an order for judgment accordingly. The determination of attorney's fees is held in abeyance.