**ROBERTS v. EATON et al.**

No. 213, Docket 22973.

United States Court of Appeals, Second Circuit.

Argued March 10, 1954.

Decided April 5, 1954.

Murray C. Bernays, New York City (Henry H. Shepard and Ellis J. Freedman, New York City, on the brief), for plaintiff-appellant.

Inzer B. Wyatt, New York City (Sullivan & Cromwell, Wm. Ward Foshay, and Francis Elwood Barkman, New York City, on the brief), for defendants-appellees.

Before CLARK, MEDINA, and HARLAN, Circuit Judges.

CLARK, Circuit Judge.

This appeal presents yet another problem in the considerable series we have had involving the meaning of "purchase" and "sale" as used in § 16(b) of the Securities Exchange Act of 1934, 15

U.S.C. § 78p(b), holding short-swing profits from dealings by "insiders" in securities of a corporation recoverable for the benefit of the corporation. Our earlier decisions are cited and discussed hereinafter. Before us now is the question whether a district court erred in declining to hold a reclassification of company stock to be a "purchase" within the statutory meaning.

From its incorporation in 1917 until 1947 Old Town Corporation, the nominal defendant, was a family enterprise, 97 per cent owned by defendant Joseph S. Eaton, his wife and children. In 1947 they sold a portion of their stock to the public. In 1952 the family (which for purposes of our discussion may be treated as a unit[1]) owned 45.9 per cent of the outstanding $5 par value common. In that year the family, contemplating Joseph Eaton's retirement, undertook negotiations to sell their remaining stock and discovered that its marketability would be improved by reclassification. Accordingly in the latter part of 1952 the directors proposed a reclassification of the company's then outstanding 320,402 shares of $5 par value common stock into 320,402 shares of common stock of $1 par value and a like number of shares of 40¢ cumulative preferred stock of $7 par value. The proposed change required approval of at least two-thirds in interest of the outstanding common stockholders, and the proxy statement soliciting this approval contained a full discussion of the proposal, together with a frank disclosure of the Eatons' plans to sell out.

At a stockholders' meeting on December 30, 1952, the proposed reclassification was authorized by a vote of 78 per cent of the outstanding shares; and it was thereafter consummated on January 12, 1953. On February 2, 1953, the Eatons concluded negotiations and sold their common stock to one McGraw and his family, simultaneously selling their preferred stock to two life insurance companies and an investment company.

Plaintiff, a stockholder of Old Town and thus authorized by the statute to sue in its behalf, asserts that the Eatons' receipt of reclassified stock was a "purchase" within § 16(b).[2] Since this was followed by a sale less than a month later the "profit," so plaintiff contends, inured to the benefit of the company. On defendants' motion for summary judgment the district court held for defendants in a carefully reasoned opinion, stressing that a reclassification of stock, like a stock dividend, did not change any essential rights of ownership in the corporation. We agree in the result reached, but on somewhat different grounds.

In the growing number of § 16(b) precedents as to what constitutes a "sale" or "purchase," two lines of cases are gradually emerging, though the dividing line is as yet somewhat shadowy. In Park & Tilford v. Schulte, 2 Cir., 160 F.2d 984, certiorari denied 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347, we held that voluntary conversion of convertible preferred stock into common was a "purchase." Similarly receipt of stock in a parent corporation in exchange for stock in a subsidiary pursuant to a plan of corporate simplification has been held a "purchase" where the insider had an option to dissent from the plan and receive

---

1. Defendant Philip A. Batchker, the president and a director of Old Town Corporation, acted independently of the Eatons; but his case comes within the same legal principles and requires no separate discussion.

2. Section 16(b), 15 U.S.C. § 78p(b), provides: "For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. * * *"

cash instead. Blau v. Hodgkinson, D. C.S.D.N.Y., 100 F.Supp. 361. Receipt of warrants by a corporate officer pursuant to his contract of employment has also been held a purchase, Blau v. Hodgkinson, supra; Truncale v. Blumberg, D.C. S.D.N.Y. 80 F.Supp. 387; and in our recent decision in Blau v. Mission Corp., 2 Cir., 212 F.2d 77, we found a "sale" in an exchange of stock of the issuer for stock of a holding company where substantial quantities of the stock received were publicly held and had an established market, despite the fact that the insider's control of and proportional interest in the issuer remained unchanged.

On the other side of the coin, in Blau v. Mission Corp., supra, we held an identical exchange not to be a "sale" when there was no public ownership and no established market for the stock received. In Shaw v. Dreyfus, 2 Cir., 172 F.2d 140, certiorari denied 337 U.S. 907, 69 S.Ct. 1048, 93 L.Ed. 1719, we held that rights to buy common stock distributed equally to all common stockholders were not "purchased," and indicated that the same reasoning would apply to stock dividends, although acquisition of stock by exercise of the rights came within the section. In the last case we further held that a private gift did not constitute a "sale"; and the same has been held true of a charitable gift, Truncale v. Blumberg, supra, D.C. S.D.N.Y., 80 F.Supp. 387, though both holdings have been strongly criticized. See Comment, The Scope of "Purchase and Sale" Under Section 16(b) of the Exchange Act, 59 Yale L.J. 510; see also Cook & Feldman, Insider Trading Under the Securities Exchange Act, 66 Harv.L.Rev. 385, 612; Loss, Securities Regulation 576 (1951).

Thus haltingly we have endeavored to effectuate the statutory mandate to curb insider short-swing speculation. The lines to be drawn become increasingly fine, but the present problem has several characteristics different from those cases where liability has been found. In the latter group the insider had an individual option to acquire the security or not as he saw fit. In those cases the securities acquired were part of a pre-existing class, substantial portions of which were publicly held and which had an independent value in a pre-existing market. In the second half of the Hodgkinson and Mission situations the securities received were of a different corporation, while in those of Park & Tilford, Truncale, and the first half of Hodgkinson the acquisition resulted in the insider holding a different proportional interest in the issuer.

The Securities and Exchange Commission, as we are informed and to our regret, see Blau v. Mission Corp., supra, has declined an invitation to express its views as *amicus curiae*. Defendants seek to draw conclusions as to these views favorable to their case from the Commission's treatment of various reports required by its rules. Thus the proxy statements for both the December 30, 1952, meeting and an annual meeting of stockholders on April 14, 1953, made no reference to possible § 16(b) liabilities, yet brought forth no adverse response from the Commission. The same was true of the annual report of the company filed on April 23, 1953, and covering the period in question. Similarly reports by certain of the defendants pursuant to § 16(a) which described their acquisition of the new stock as "by reclassification" neither brought forth inquiry nor were included in the Commission's monthly "Official Summary" of purchases and sales by insiders. Defendants support their conclusions by unofficial statements of the Commission's practice as set forth in Cook & Feldman, supra, 66 Harv.L.Rev. 385, 388 n. 10, 392–93, 395–97, 407 and n. 85, 410–11. The Commission is not, however, charged with enforcement of § 16(b); and we cannot take its performance of its self-assumed duties as conclusive of the issues before us.

On the other hand, plaintiff seeks to divine the Commission's position from

its latest promulgation, amending Rule X–16B–6 (February 25, 1954). The amendment, set forth in the margin,[3] creates another in a series of narrow exemptions to our section. It is relevant to our problem only by stretching its negative implications beyond all reasonable bounds. By its terms it does not apply to cases of prior date such as ours, and the widely variant readings given it by counsel reinforce an inclination to deem it not here relevant. It serves merely as an example of the Commission's partial power of legislation in the premises to which we referred in the Mission case.

Thus left to our own resources we are not inclined at this juncture to attempt enunciation of a black-letter rubric. Strong arguments have been advanced against each of the enumerated distinctions as not certainly insuring the necessary prophylaxis to the transaction; but each is to some degree persuasive that the transaction is not susceptible to abuses within the ambit of § 16(b). Thus the validity of the distinction based upon the option to the individual has been seriously questioned where an insider controls and can work his will through the board of directors. See Park & Tilford v. Schulte, supra, 2 Cir., 160 F.2d at page 988. But the objection loses some of its force where, as here, time-consuming ratification by the stockholders was required, and not only the acquisition, but the proposed subsequent sale, was fully disclosed. Nor can it be gainsaid that like treatment of all stockholders will in most cases remove the possibility of abuse.

Similarly to the argument that the Eatons received a security without pre-existing market value plaintiff has directed a forceful reply based upon the value of "when-issued" securities, backing it up with the prices at which the reclassified securities at bar in fact sold on the first day that they were traded. But conceding that a veteran of the market place can venture a shrewd guess as to the future market value of proposed securities of well-known companies, we think this does not settle the question here. In Mission we predicated liability on the receipt of seasoned and readily marketable securities, while immunizing the similar receipt of a newly created stock issue. We think the distinction valid, for the intrinsic value of a new issue must relate directly to the underlying property and any variance in market price must depend on market preferences. So here it seems that any change in value due to the split or reclassification of stock comes substantially from the actual or expected tastes and preferences of the public for particular types and forms of securities; and values due to company prospects or plans will be reflected in the ordinary market value of the original stock. The nature of this increment for market taste would seem quite variable, depending upon, e. g., the kind, size, fame, standing, and like factors as to the particular corporation; thus often it would be a most speculative affair, involving a potentially large judgment against corporate officers. But further as to this type of market bonus, the insider has no more knowledge than the rest of the world, and is not benefiting by the fruits of inside speculation. It must be recalled that § 16(b) does not strip the insider of all advantage. He may increase or decrease his holdings according to the dictates of his special knowledge. It is only the short-swing transaction which must yield profits to the company alone.

3. "(c) The Commission also hereby exempts, as not comprehended within the purposes of section 16(b) of the Act, the disposition of a security, purchased in a transaction specified in paragraph (a), pursuant to a plan or agreement for merger or consolidation, or reclassification of the issuers' securities, or for the exchange of its securities for the securities of another person which has acquired its assets, where the terms of such plan or agreement are binding upon all stockholders of the issuer except to the extent that dissenting stockholders may be entitled, under statutory provisions or provisions contained in the certificate of incorporation, to receive the appraised or fair value of their holdings."

Further reassurance can be found in the fact that after the change in the stock the Eatons continued interested in the same company, with their interests remaining proportionally unchanged—until, of course, their eventual sale of their entire block of stocks. This factor is the one substantially relied on by the district judge in his decision and by defendants in their argument. It is of course an essential for defendants' position; but for reasons stated in the Mission case and here we do not think it is alone enough to immunize the transaction from application of the statute. As a matter of fact it seems quite possible that no one of the factors we have enumerated, standing alone, would be sufficient for that result. But in cumulative effect we think they are. The reclassification at bar could not possibly lend itself to the speculation encompassed by § 16(b). This being so, it was not a "purchase" and the decision below was correct.

Order affirmed.