RHEEM MANUFACTURING COM-
PANY, a Corporation, Appellant,

v.

R. S. RHEEM, Appellee,

Ann J. Mathes, Intervenor.

No. 17206.

United States Court of Appeals
Ninth Circuit.

Oct. 13, 1961.

Garry, Dreyfus & McTernan, San
Francisco, Cal., Morris J. Levy, New
York City, of counsel, for intervenor
Ann J. Mathes.

Marshall P. Madison, John B. Bates
and Noble K. Gregory, San Francisco,
Cal., Pillsbury, Madison & Sutro, San
Francisco, Cal., of counsel, for appellee.

Before ORR and MERRILL, Circuit
Judges, and KILKENNY, District
Judge.

ORR, Circuit Judge.

At the request of Ann J. Mathes, one
of its stockholders, appellant company
instituted a suit for the recovery of
profits realized by appellee Richard S.
Rheem from the alleged purchase and
sale, within six months, of securities in
Rheem Manufacturing Company (here-
inafter the Company) listed on the New
York Stock Exchange. In its suit the
Company sought to invoke the "insider
trading" provisions of the Securities Ex-

change Act of 1934, 15 U.S.C.A. § 78p (b).[1]

We reach the conclusion that the judgment of the trial court should be affirmed.

The Board of Directors of the Company determined that the judgment of the trial court should not be appealed, but the stockholder thought otherwise and with the permission of this court intervened and perfected an appeal.

Appellee Rheem is a director of the Company and was its chief executive officer from 1926 until his resignation on June 5, 1958. In 1949 the Company adopted an Employees' Incentive Bonus Plan and Trust (hereinafter the Plan) for the purpose of providing retirement benefits in the form of insurance, annuities, Company stock or cash to eligible and participating employees, of which Mr. Rheem was one. The Plan and accompanying trust agreement provided that the Company would make annual contributions of a percentage of its net profits to this retirement fund. Although the Company reserved the right to terminate the Plan at any time, it was provided that contributions once actually made would not revest in the company as a result of such termination. Participation by an employee was to end and his interest in the Plan was to vest as of the last day of the month prior to a termination of his employment.[2]

Because of his resignation as the Company's chief executive officer, Mr. Rheem's interest in the Plan vested in him as of May 31, 1958. On the date of his resignation, June 5th, Mr. Rheem had a conversation with two members of the Advisory Committee administering the Plan. During that conversation he expressed his desire to receive Company stock in the amount of his interest in the Plan. His reason for preferring stock was the purpose of building up his estate on a long-term basis.

Between the 16th and the 24th of June, 1958, there took place an exchange of correspondence among Rheem, the Advisory Committee, and the bank administering the trust. Through this correspondence it was determined that the transfer of stock would take place in the following manner: Mr. Rheem would receive a check for the amount of his interest in the Plan; he would immediately issue his personal check in an amount equal to the even number of shares multiplied by $12.50 (the June 5th closing price) which most closely corresponded to the amount of his interest in the Plan. As the net result of this transaction of June 24th, Rheem received 4,962 shares of Company common and a very small cash balance.

For some time prior to May, 1958, and through December, 1958, Mr. Rheem was indebted to American Trust Company (hereinafter the bank) in an amount considerably in excess of his assets, all of which had been pledged to the bank as security for his obligations to it. The stock received by him in connection with his interest in the Plan was also trans-

1. "For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter * * *".

2. The Plan was amended from time to time until 1958, but none of the amendments had any material effect on Mr. Rheem's rights or interests.

ferred to the bank under the general pledge agreement then in effect. The bank determined that at the time the price of the stock approached $20 per share, liquidation should begin, and instructed a brokerage firm to that effect. On December 4, 1958, sales "for the account of Richard S. Rheem" began in accordance with this arrangement. It is for the recovery of the profit thus realized that judgment was asked.

The trial court made, among others, the following findings:

1. "Defendant * * * acquired 4,962 shares of Rheem Manufacturing Company common stock on June 5, 1958.[3]

2. "Said stock was acquired by Richard S. Rheem in good faith in connection with a debt previously contracted between defendant and plaintiff * * *.

6. "Defendant did not sell any stock or equity security of plaintiff * * *."

Objections are made to certain of the findings. We need concern ourselves with the second only. In reviewing this finding, we keep in mind the intended beneficial purposes of said statute.

After an extensive investigation in the early '30's, the Congress determined that one of the principal vices leading to the collapse of investor confidence in the securities markets was corporate "insider" trading based on advance information not available to less favorably situated shareholders. See Senate Committee on Banking and Currency, Stock Exchange Practices, S.Rep. No. 1455, 73d Cong., 2d Sess. 55–68 (1934). The "outrageous scandal" of these recognized yet largely unremediable breaches of fiduciary duty led directly to the enactment of the said stat-

ute. The excuses for various insider transactions which were presented to Congressional Committees convinced the authors of the legislation that civil liability and an objective measure of proof were indispensable ingredients of an effective remedy for the proven vice. Hence, the Congress adopted "a crude rule of thumb" making the profit from an insider's short swing transaction recoverable by the corporation. Under the principal clause of § 16(b) no actual use of inside information or intention to get out on a short swing is required in order to give rise to liability. See 2 Loss, Securities Regulation 1041–1044 (1961).

There is, however, an express exemption from liability contained in § 16 (b) relating to a security "acquired in good faith in connection with a debt previously contracted." In considering the application of said exemption to the situation we are confronted with, we apply familiar rules both of construction and of burden of proof. Appellee Rheem, urging as he does the favorable construction of an exception from a statute of general application, "has the burden of bringing himself *clearly* within it." Walling v. Reid, 8 Cir., 1943, 139 F.2d 323, 327. This rule has as its corollary the rule that the proponent has the burden of proving every fact essential to the invocation of the exemption. Schlemmer v. Buffalo, Rochester & Pitts. Ry., 1906, 205 U.S. 1, 10, 27 S.Ct. 407, 51 L.Ed. 681. These rules must always be applied in such a way as to carry out the intent of the law. See I. C. C. v. Service Trucking Co., 3 Cir., 1951, 186 F.2d 400.

The exemption under consideration consists of three key phrases, none of which has received definitive judicial construction.[4] First, it must be satisfactorily established that there existed "a debt previously contracted" between

---

3. If this finding is correct, the earliest sale of shares, on December 4, 1958, would not be "within any period of less than six months" from the acquisition, and hence not within the statute. See Stella v. Graham-Paige Motor Corp., D.C. S.D.N.Y.1955, 132 F.Supp. 100, 104–105, cause remanded 2 Cir., 1956, 232 F.2d 299, certiorari denied 1956, 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52.

4. Nor does the legislative history cast any light on the intent of the framers. See, e. g., H.Rept. No. 1838, 73d Cong., 2d Sess. (1934) (Conference report).

Rheem and the Company. The rather meager development which this phrase has received is mostly by way of exclusion. Thus, it has been said that convertible preferred stock did not constitute a "debt" so as to put the sale of the subsequently received common beyond the reach of the statute, Park & Tilford, Inc. v. Schulte, 2 Cir., 1947, 160 F.2d 984, 987 and that an employment-incentive contract providing for regular remuneration in warrants was not within the exemption, Truncale v. Blumberg, D.C.S.D. N.Y.1948, 80 F.Supp. 387, 392 (dictum).[5] Also, the S.E.C. has adopted regulations exempting acquisitions of shares and restricted stock options under certain stock bonus, stock option, or similar plans,[6] thereby indicating that such arrangements are not within the statutory exemption.

■ The instant case can be distinguished from the situations above set forth. Here there was an obligation to pay a fixed sum certainly and at all events, existing prior to and apart from the settlement of the obligation by the transfer of stock, which we are persuaded determines the existence of "a debt previously contracted" within the meaning of the statute. This phrase is thus complementary to the requirement of good faith. It gives further assurance that inadvertent profits at the expense of unconsulted shareholders will not be made on a regularly recurring basis, as would be the case with many otherwise uncontrolled bonus and option plans. Yet, it makes possible the one-shot settlement of matured debts in any manner the parties in good faith may choose. The only case to our knowledge to invoke this exemption involved just such

a good faith settlement of a matured obligation. See Smolowe v. Delendo Corp., 2 Cir., 1943, 136 F.2d 231, 239, 148 A.L. R. 300.

Secondly, we are required to determine whether the stock in question was acquired "in connection with" the debt previously contracted. The intervenor argues that we must view each part of the settlement of the debt as a separate transaction, and if so it could then appear that Rheem's issuance of a personal check in payment for the stock was an independent and unrelated purchase of shares. To the contrary, it was clearly established at the trial that the form of the settlement was necessitated purely by the requirements of the Company's accounting department. We look always to substance rather than form in such matters. The exchange of checks and the delivery of stock was in fact all one transaction. "In connection with" is broader than "in direct discharge of," and contemplates the kind of integrated settlement which took place. Indeed, the parties have stipulated that "Rheem acquired 4,962 shares * * * in connection with his interest as a participant in plaintiff's employees' Incentive Bonus Plan and Trust."

The controlling question is whether Mr. Rheem has established his "good faith" in this transaction within the meaning of the statute. We observe that "the crude rule of thumb" and objective measure of proof which form the basis of the principal clause of § 16(b) have been expressly abandoned in this exemption. Intervenor argues that a showing that the acquisition of this stock was completely involuntary is necessary for appellee to demonstrate his good faith.[7]

5. In the Truncale case, however, it is not clear whether the recurring nature of the remuneration in warrants impugned good faith or whether the anticipated instant discharge of the debt at maturity destroyed the element of "previous contracting."

6. See 17 C.F.R. § 240.16b–3. There is nothing in the present record to indicate

that the Plan is exempted by these regulations.

7. See Perlman v. Timberlake, D.C.S.D. N.Y.1959, 172 F.Supp. 246, 255 (dictum), Cook and Foldman, Insider Trading Under the Securities Exchange Act, 66 Harv.L.Rev. (pt. 2), 612, 632–633 (1951) and Rubin and Feldman, Statutory Inhibitions Upon Unfair Use of Corporate Information by Insiders, 95 U.Pa.L.Rev. 468, 487 (1947).

No such condition is contemplated. In practically every case we have considered, a creditor has the "choice" of exercising his right to demand legal tender, as opposed to settling for anything else which might be offered. And the choice is not onerous, for, unless the stock is worthless, in which case no one would settle for it, it can be readily converted into cash by the debtor and the cash in turn can be used to discharge the debt. The statutory language does not reveal that this exemption was intended to be confined to the exceedingly few cases where a unique fact situation might furnish a basis for finding a complete lack of choice on the part of the creditor. On the other hand, in a given case the fact of involuntariness might not be conclusive, for the creditor might still, upon acquisition of the stock, have advance information and an intention to get out on a short swing.

In short, the statute requires us to look to subjective intent, and in so doing we weigh the element of choice as but one factor. This is consistent with the apparent purpose of this exemption to make possible the subjectively good faith settlement of a pre-existing obligation in whatever way the parties thereto see fit, including the possibility of a settlement in stock.

We have said that the party seeking to invoke this exemption has the burden of bringing himself clearly within it. We do not suggest that there may not be cases so shot through with the possibilities of unfair speculation that a party cannot overcome the strong inference of bad faith. Such is not the instant case. Mr. Rheem declared that his purpose in electing to take stock was to build up his estate on a long-term basis. That purpose was frustrated by a forced liquidation of the stock pursuant to a decision of the bank to whom Rheem was indebted. The district court explicitly found that "[a]t no time did the defendant use or attempt to use any information which may have been obtained by him by reason of his relationship to the plaintiff," and that "[a]t all times defendant * *

acted in good faith with respect to the matters referred to in the complaint * * *." That finding is not clearly erroneous.

Affirmed.