Joseph Allen SCHUR, Plaintiff,

v.

Hal A. SALZMAN et al., Defendants.

No. 71 Civ. 2440.

United States District Court,
S. D. New York.

Oct. 9, 1973.

Aranow, Brodsky, Bohlinger, Benetar, Einhorn & Dann, New York City, for plaintiff; Anthony L. Tersigni, Robert E. Helpern, New York City, of counsel.

Bass & Ullman, New York City, for defendant Hal A. Salzman; Milton A. Bass, David Ficksman, New York City, of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, for defendant Papercraft Corp.; Henry P. Wasserstein, New York City, of counsel.

EDWARD WEINFELD, District Judge.

This is an action pursuant to section 16(b) of the Securities Act of 1934[1] to recover "short swing" profits allegedly realized by the defendant Hal A. Salzman in the purchase and sale of shares of stock of Odell, Inc.[2] Subsequent to the transactions at issue, Odell was merged into Papercraft Corporation, as a result of which plaintiff, a stockholder of Odell, became a stockholder of Papercraft. Previously, in April 1970, plaintiff, while still the owner of his Odell shares, had served a written demand upon Odell to bring suit for the recovery of the claimed profits realized by Salzman, but it failed to do so prior to the merger, as did Papercraft thereafter. More than sixty days having elapsed since the service of the demand, plaintiff commenced this action in June 1971 under section 27 of the 1934 Act,[3] naming as defendants Salzman, Odell and Papercraft. The latter, as successor to Odell, claims in its answer such interest in any recovery in this action as to which it may be entitled.

In the main, the essential facts are not in dispute. Salzman was Chairman of the Board of Directors and chief executive officer from January 1968 to November 28, 1969, when he resigned. His resignation was pursuant to an agreement with Papercraft entered into on November 25, 1969, and subject to certain conditions that were fulfilled on November 28, whereby Salzman sold to Papercraft all his stockholdings in Odell.[4] He then delivered to Papercraft 45,156 shares of Odell common stock and 1,257 shares of preferred (convertible into common at the ratio of four shares of common for one share of preferred) "for an aggregate consideration of $1,505,520," or $30 per share.

The agreement under which Salzman sold his shares required, in addition to his resignation as an officer and director of Odell, that he use his best efforts to amend Odell's by-laws with respect to directors; that he cause all but five di-

1. 15 U.S.C. § 78p(b) (1970).

2. Odell's common stock was duly registered pursuant to section 12(g) of the Act. 15 U.S.C. § 78l(g) (1970).

3. 15 U.S.C. § 78aa (1970).

4. Salzman inadvertently retained 107 shares of preferred stock.

rectors to resign and a named individual to be elected Chairman of the Board of Odell; and that he waive his right to salary from Odell of $100,000 per year under an employment contract, which expired on December 1, 1973. He was retained as a consultant until May 31, 1970 at $100,000. Contemporaneously, Papercraft entered into an interdependent contract with S. David Laurence for the sale by him to Papercraft of 85,000 shares of Odell common stock for $1,530,000 (or $18 per share). The foregoing agreements were carried out and the merger of Odell into Papercraft was achieved in March 1971.

In the six-month period preceding November 28, 1969, Salzman increased his holdings of Odell stock by various purchases, which were included in those sold to Papercraft. Recovery of short swing profits is sought as to five separate transactions involving a total of 5,340 shares, which are considered separately hereafter.[5]

■■ The defendant's threshold position is essentially that the transactions are beyond the pale of section 16(b) because they were not the usual "garden-variety" [6] type; that the sale of all his shares was incidental to, and only a part of, a larger package which included his resignation as a director, an obligation to exert his best efforts to effect a change in the by-laws and the composition of the Board, and the termination of his employment contract with Odell. In substance, the argument runs that Papercraft was paying a premium over the market price to obtain control shares

and that section 16(b) was not designed to recapture the increment paid for the transfer of control power and the other items. This argument, whatever its merits with respect to the amount of recoverable profits if section 16(b) is found applicable, scarcely addresses itself to the statute's purpose to prevent the unfair use of inside information by corporate insiders. The short answer is that, considering defendant's insider position, his special knowledge of the facts surrounding Papercraft's interest in acquiring Odell, his participation in the negotiations, and his awareness that his shares, as well as those of Laurence, were deemed vital by the acquiring interests, there existed the possibility of abuse of inside knowledge so as to make section 16(b) applicable.[7] Thus, armed with the knowledge that his, as well as other shares were required by the takeover group to assure success of the proposal, and that such shares were worth a premium, there was the incentive, if not the temptation, to buy additional shares from public shareholders so as to profit from their subsequent resale at the higher price Papercraft was willing to pay. Indeed, this is precisely what plaintiff claims motivated Salzman in his purchases during the six months preceding the sale and delivery of his shares. However, lack of motive, intent or improper conduct are irrelevant in section 16(b) suits.[8] Given the opportunity for unfair inside trading, it is the fact of the transaction which automatically brings the statute into play and requires that the profits realized be disgorged.[9] The defendant's contention

---

5. There were other purchases, but no claim is made as to them because the price exceeded the $30 per share that plaintiff alleges defendant received from Papercraft.

6. *Cf.* Abrams v. Occidental Petroleum Corp., 450 F.2d 157, 162 (2d Cir. 1971), aff'd sub nom., Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973).

7. *Cf.* Blau v. Lamb, 363 F.2d 507, 519 (2d Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967).

8. Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 595, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973); Reliance Elec. Co. v. Emerson Elec. Co., 404 U.S. 418, 422, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972); Feder v. Martin Marietta Corp., 406 F.2d 260, 262 (2d Cir. 1969), cert. denied, 396 U.S. 1036, 90 S.Ct. 678, 24 L.Ed.2d 681 (1970); Blau v. Oppenheim, 250 F.Supp. 881, 887 (S.D.N.Y.1971).

9. The statute "is not aimed solely at the actuality of evil . . . but also at po-

that there was an absence of speculative temptation because there was no need for him to acquire any publicly held shares, since without them those he previously held prior to the six-month period (together with Laurence's) were sufficient to transfer effective control is without substance.[10] Control stock usually commands a premium. When an insider is aware he can sell such shares, the temptation exists to realize additional profit through the purchase of publicly held stock. The statute is applicable; to hold otherwise would defeat its basic purpose.

The defendant's contention that the application of section 16(b) in the circumstances here presented would prevent control stockholders from selling their shares is groundless. The shares that Salzman owned six months before the Papercraft transaction constituted more than 90% of those sold by him; these (together with Laurence's) were sufficient to transfer control to Papercraft and to enable it to put through the merger. Section 16(b) imposes no liability for the profits derived by him from the sale of those shares; it does require that he disgorge the profits realized on the additional shares that he purchased during the six months preceding the Papercraft agreement; it does because it is an effective means of eliminating the evil that exists by the insider's use of inside information in engaging in those transactions.[11] To allow him to retain the profits on those shares would frustrate the clear purpose of the Act.

The defendant next contends that even if section 16(b) is applicable, there are no recoverable short swing profits, a contention which in some respects parallels his claim of non-applicability of the section. Salzman received the equivalent of $30 per share from Papercraft; the average market price of the stock at the time was $18. The defendant's position is that the $12 per share differences represented a premium paid by Papercraft for the transfer of control, his resignation as an officer and director, and the cancellation of his employment contract. Since the statute speaks in terms of profit from the purchase and sale of a security, the defendant reasons that the portion of the purchase price attributable to consideration other

tentiality for evil inherent in all insider short-swing trading." Newmark v. RKO General, Inc., 425 F.2d 348, 350–351 (2d Cir.), cert. denied, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970).

10. In focusing upon the purported absence of the possibility of speculative abuse in this case, defendant is attempting to invoke the application of the so-called "pragmatic" approach to section 16(b), first explicitly enunciated by this circuit in Blau v. Lamb, 363 F.2d 507 (2d Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967), and apparently approved by the Supreme Court in the recent case of Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 594–595 n. 26, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973). We need not concern ourselves with the relative merits of the "objective" test as opposed to the "pragmatic" approach. The pragmatic approach, however, has always been applied to "unorthodox" transactions (e. g., conversions, stock reclassifications, corporate reorganizations), where there is a question whether a purchase and sale, within the

meaning of section 16(b), had taken place. See, e. g., Bershad v. McDonough, 428 F.2d 693 (7th Cir. 1970), cert. denied, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971); Ferraiolo v. Newman, 259 F.2d 342 (6th Cir. 1958), cert. denied, 359 U.S. 927, 79 S.Ct. 606, 3 L.Ed.2d 629 (1959); Roberts v. Eaton, 212 F.2d 82 (2d Cir.), cert. denied, 348 U.S. 827, 75 S.Ct. 44, 99 L.Ed. 652 (1954); Shaw v. Dreyfus, 172 F.2d 140 (2d Cir.), cert. denied, 337 U.S. 907, 69 S.Ct. 1048, 93 L.Ed. 1719 (1949). It has never been used in cases of "garden variety" cash for stock transactions where a purchase and sale had clearly occurred, as it has never been doubted that section 16(b) was intended to reach such dealings In the instant case, there is no question that there was a purchase and sale within a six-month period. Moreover, the sale was simply one of stock for cash; the only issue is how much, if any, of the cash that defendant received is attributable to items other than the stock.

11. Cf. Gratz v. Claughton, 187 F.2d 46, 49 (2d Cir.), cert. denied, 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951).

than the securities themselves must be disregarded.

■ The defendant's attempt to fragmentize the purchase price by allocating various amounts to items other than the shares is counter to the holding in Newmark v. RKO General, Inc.[12] that the value of a control premium is includable in determining the sales price of 16(b) stock. The defendant seeks to distinguish *Newmark* upon the ground that there the defendant *received* stock with a control value in exchange for his 16(b) stock, whereas here he *sold* 16(b) stock with a control premium that was separable from its market price. The claimed basis for distinction is without support. Indeed, there is even more reason to include the control premium in determining what Salzman received since, as already noted, there exists the opportunity for an insider like Salzman who is negotiating for the sale of control [13] to engage in the speculative activity at which the statute is aimed. Furthermore, the defendant's position cannot prevail against the explicit language and the clear purpose of the statute which, to prevent the unfair use of information, requires the insider to surrender "any profit realized" on the proscribed transactions.[14] "Any profit" is not limited nor confined; it is all-inclusive.

■ In any event, the burden of proof is upon the defendant, a fiduciary, to establish that his profits are less than those claimed by the plaintiff, particularly where difficulty in ascertaining the precise damages is due to the insider's conduct.[15] He has failed to carry that burden. The evidence establishes that he recieved $30 a share for his stock. Salzman testified upon his deposition that he received $30 a share. His agreement to sell contains no breakdown specifying what amount is for the shares as distinguished from consideration for the cancellation of the contract or for other non-stock items.[16] On his income tax return he reported for capital gain purposes the receipt of $30 a share.[17] The defendant offered no proof, expert or otherwise,[18] as to the value of the non-stock items that he seeks to segregate from the stock. Resignation from a directorship or other office by a control stockholder upon a sale of his shares is not only commonplace, but usually is required by the buyer; neither the resignation nor his agreement to use "his best efforts" to various ends has any real monetary value. Upon the cancellation of his employment agree-

---

12. 305 F.Supp. 310 (S.D.N.Y., 1969), aff'd, 425 F.2d 348 (2d Cir.), cert. denied, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970) ; cf. Fistel v. Christman, 135 F.Supp. 830 (S.D. N.Y.1955).

13. Effective control at times may be exercised by less than a majority of the outstanding shares. *See* Gratz v. Claughton, 187 F.2d 46, 49–50 (2d Cir.), cert. denied, 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951).

14. 15 U.S.C. § 78p(b) (1970).

15. Stella v. Graham-Paige Motors Corp., 232 F.2d 299, 302 (2d Cir.), cert. denied, 352 U. S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52 (1956).

16. In fact, the contract does not even mention control, much less that part of the sales price is in consideration for it.

17. While it is recognized that income tax rules do not control section 16(b) issues, Truncale v. Blumberg, 88 F.Supp. 677, 678 n. 1 (S.D.N.Y.), aff'd per curiam, Truncale

v. Scully, 182 F.2d 1021 (1950) ; *see* Smolowe v. Delendo Corp., 136 F.2d 231, 238 (2d Cir.), cert. denied, 320 U.S. 751, 64 S. Ct. 56, 88 L.Ed. 446 (1943) ; Perlman v. Timberlake, 172 F.Supp. 246, 257 (S.D.N.Y. 1959), a taxpayer's statements on his tax return may nevertheless be considered. *See* Blau v. Mission Corp., 212 F.2d 77, 80 (2d Cir.), cert. denied, 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138 (1954). Incidentally, if the sales price of the securities is to be limited to $18 per share and the remainder of the payment apportioned to non-stock items, it appears that at least part of the latter should be treated for tax purposes as ordinary income. *See, e. g.,* Foxe v. Commissioner, 53 CCH Tax Ct.Rep. No. 4 (1969) (consideration received by taxpayer for termination of employment agreement held taxable as ordinary income).

18. *Cf.* Newmark v. RKO General, Inc., 425 F.2d 348, 357–358 (2d Cir.), cert. denied, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 348 (1970).

ment he was retained as a consultant through May 31, 1970, for which he was paid $100,000, and was free to seek income from other employment,[19] which he apparently did.

To adopt the defendant's position would create a host of problems that would tend to weaken rather than to enforce the strict insider's liability contemplated by section 16(b). To probe into the component parts of the price received by or paid to an insider would detract from the objective test in appraising transactions—a test that has served to enforce the liability of an insider in accordance with the prophylactic purpose of the statute. The courts, particularly in our circuit, have consistently interpreted the section in the broadest possible terms in order not to defeat its objectives, resolving all doubts and ambiguities against the insider.[20] Designed "to squeeze all possible profits"[21] out of stock transactions which come within its scope, the section is probably the most effective force in protecting the public against those insider abuses which gave birth to the legislation.[22] The purpose of the law would best be realized by applying the doctrine that "when damages are at some unascertainable amount below an upper limit and when uncertainty arises from the defendant's wrong, the upper limit will be taken as the proper amount." [23] Any other policy would permit a control director to escape the full consequences of his wrongful conduct.

The defendant advances varied other contentions in resisting the return of the profits derived in the transactions, none of which is of substance nor merits extended consideration.

First, the defendant recognizes the general rule that, in computing recoverable profits under section 16(b), purchases and sales of identical securities need not be matched one against the other.[24] Nevertheless, he argues that it is inapplicable in the instant case because of the alleged non-fungibility of the shares purchased and sold in the transactions here at issue. This position is based upon the fact that of the shares sold to Papercraft, only 1,060 were registered; the remainder were unregistered investment stock that bore a legend restricting their sale except in compliance with the Securities Act of 1933. As to the shares purchased in the preceding six-month period, only 2,600 were registered shares purchased on the open market. Thus he contends that for section 16(b) purposes the registered and unregistered securities are not fungible—they cannot be matched one against the other. The thrust of the argument is that a large stockholder could not frustrate the purpose of the Act simply by keeping a reserve of unregistered restricted securities. The argument proceeds that since in the short

19. Indeed, if Papercraft had refused to honor the employment contract, Salsman would have been obliged to seek similar employment in order to mitigate his damages. See, e. g., Cornell v. T. V. Development Corp., 17 N.Y. 2d 69, 268 N.Y.S.2d 29, 215 N.E.2d 349 (1966); McClelland v. Climax Hosiery Mills, 252 N.Y. 347, 169 N.E. 605 (1930).

20. Blau v. Oppenheim, 250 F.Supp. 881, 884–885 (S.D.N.Y.1960).

21. Smolowe v. Delendo Corp., 136 F.2d 231, 239 (2d Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943).

22. Reliance Elec. Co. v. Emerson Elec. Co., 404 U.S. 418, 422, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972).

23. Gratz v. Claughton, 187 F.2d 46, 51–52 (2d Cir.), cert. denied, 341 U.S. 920, 71 S. Ct. 741, 95 L.Ed. 1353 (1951). See also Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264–265, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Stella v. Graham-Paige Motors Corp., 232 F.2d 299, 302 (2d Cir.), cert. denied, 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52 (1956).

24. Gratz v. Claughton, 187 F.2d 46 (2d Cir.), cert. denied, 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951); Smolowe v. Delendo Corp., 136 F.2d 231 (2d Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943); Blau v. Allen, 163 F.Supp. 702 (S. D.N.Y.1958).

swing period he purchased a total of 2,600 shares of registered common stock and sold to Papercraft only 1,060 of that type, the difference of 1,540 shares should be disregarded in determining the profits realized by him—in sum, the return of profits should be limited to that realized on the 1,060 shares. The short answer to this claim of lack of fungibility is that the defendant had no difficulty in selling all his shares, unregistered as well as registered, restricted as well as non-restricted, and realized the same profit per share on each type sold. Not only is his contention that unregistered stock cannot be matched against the registered stock without substance,[25] but to sustain this claim would sanction an avenue of escape of the type that insiders from time to time contrive in an effort to retain profits derived from transactions which section 16(b) commands they surrender.

Second, the defendant, post trial, raises a point not heretofore urged—that he was not the beneficial owner of half of 2,200 shares purchased with funds from a joint bank account with his wife. The defendant, upon his deposition, testified that this stock, "even though . . . purchased in her name, . . . would be stock belonging to both of us."[26]

 Absent special circumstances, the insider is regarded as the beneficial owner of stock in his spouse's or child's name.[27] The Securities and Exchange Commission's release on the subject indicates the basis for deeming the insider the beneficial owner. "Absent special circumstances such relationship ordinarily results in such person obtaining benefits substantially equivalent to ownership . . . the ability to exercise a controlling influence over the purchase, sale or voting of such securities."[28] There is upon this record not the slightest evidence of "special circumstances" to support a claim that defendant was not in fact the beneficial owner of all the 2,200 shares or that he did not control their purchase, sale or other disposition.

 Defendant next contends that no proper demand was made upon Papercraft to bring this action and therefore plaintiff cannot maintain it. Plaintiff served a demand on Odell on April 23, 1970; however, Odell did not institute suit pursuant to the demand. The merger of Odell into Papercraft was consummated on March 26, 1971. Plaintiff was not required to serve a new demand on Papercraft as the successor corporation. It succeeded to the assets of Odell, which included the chose in action based upon the short swing profit claim, and acquired those assets subject to all liabilities. Papercraft acquired the 16(b) claim encumbered by plaintiff's previous demand upon Odell, which not having been acted upon within the sixty-day period, gave plaintiff the right to commence this action.[29] It has consistently been held that the demand provision is for the benefit of the corporation on whose behalf the claim exists, and that standing to object to failure to make a proper demand rests only in

25. This, of course, does not preclude an insider from urging, upon proper proof, a diminution of the profit claimed by reason of the nature of the stock involved in the short swing transactions. See Lewis v. Wells, 325 F.Supp. 382, 386–387 (S.D.N.Y.1971).

26. Salzman deposition, Plaintiff's Ex. 2, p. 30.

27. See V Loss, Securities Regulation, pp. 3063–66 (Supp. to 2d ed. 1969) ; cf. B. T. Babbitt, Inc. v. Lachner, 332 F.2d 255 (2d Cir. 1964) (in which the parties agreed that for section 16(b) purposes the sale of stock by the insider's wife may be attributed to him). See also Jefferson Lake Sulphur Co. v. Walet, 104 F.Supp. 20 (E.D.La.1952), aff'd, 202 F.2d 433 (5th Cir.), cert. denied, 346 U.S. 820, 74 S.Ct. 35, 98 L.Ed. 346 (1953) (court held insider liable under 16(b) for all short swing profits even though, under community property law of state, securities and profits made thereon belonged to the marital community).

28. SEC Securities Exchange Act Release No. 7793 (1966).

29. 15 U.S.C. § 78p(b) (1970).

the corporation.[30] Moreover, Papercraft raises no issue on this score; to the contrary, it has appeared in this action and in its answer requests that, in the event of a recovery, the proceeds be awarded to it. Upon all the circumstances, plaintiff served a proper demand, and more than sixty days having elapsed with neither Odell nor Papercraft having commenced suit, this action is properly maintainable by him.

■ The defendant further argues that when his shares of stock were sold and delivered on November 28, 1969, three days after the date of the agreement, he was no longer a director and therefore not subject to the provisions of section 16(b). His reliance upon Reliance Electric Co. v. Emerson Electric Co.[31] as authority for his position disregards not only the holding of that case, which was limited to a 10% shareholder —as distinguished from a director or officer—on the basis of the precise statutory language, but also the holding of our circuit in Feder v. Martin Marietta Corp.[32] *Reliance* cannot be read to overrule the clear holding in *Feder*.[33]

■ The defendant next contends that the corporation is estopped from recovering his short swing profits because it participated in and benefited from defendant's sale of the securities to it. This plea is as lacking in substance as are most of the others. The authorities are in accord that a corporation whose securities are the subject of the short swing profits is not estopped from recovering them, since a prime objective of section 16(b) is the prevention of questionable transactions on the part of insiders to the detriment of minority or outside shareholders.[34]

■ Finally, the defendant asserts with respect to one transaction (Lerner) that the shares were repurchased to satisfy what is described as a "moral obligation" or a "debt of honor," to wit, an oral promise to the Lerners when they acquired Odell shares that, in the event he ceased being a director of Odell, he would see to it they would be able to sell the shares—and consequently the shares are exempt under section 16(b), having been "acquired in good faith in connection with a debt previously contracted."[35] There has been little judicial contruction of the "debt previously contracted" exemption and the legislative history sheds little light on the meaning of the phrase. But the paucity of judicial opinion or absence of legislative history does not mean that common sense has taken flight in defining the phrase. Clearly it refers to a legal, enforceable obligation. To equate an unenforceable so-called "debt of honor" with an enforceable "debt previously contracted" would provide a most effective means of circumventing the clear mandate of section 16(b).

Since none of the defenses precludes the return of profits, we turn to each of the five transactions to determine the

30. Benisch v. Cameron, 81 F.Supp. 882, 885 (S.D.N.Y.1948); Grossman v. Young, 72 F. Supp. 375, 380 (S.D.N.Y.1947); *cf.* Henss v. Schneider, 132 F.Supp. 60, 64 (S.D.N.Y. 1955).

31. 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972).

32. 406 F.2d 260 (2d Cir. 1969), cert. denied, 396 U.S. 1036, 90 S.Ct. 678, 24 L.Ed.2d 681 (1970).

33. *See* Reliance Elec. Co. v. Emerson Elec. Co., 404 U.S. 418, 424 n. 4, 92 S.Ct. 596, 30 L.Ed.2d 575 (1971); Levy v. Seaton, 358 F. Supp. 1 (S.D.N.Y.1973).

34. Roth v. Fund of Funds, Ltd., 405 F.2d 421 (2d Cir. 1968), cert. denied, 394 U.S. 975, 89 S.Ct. 1469, 22 L.Ed.2d 754 (1969) (sale to issuer at its suggestion); Magida v. Continental Can Co., Inc., 231 F.2d 843 (2d Cir.), cert. denied, 351 U.S. 972, 76 S.Ct. 1031, 100 L.Ed. 1490 (1956); Allied Artists Pictures Corp. v. Giroux, 312 F.Supp. 450, 451 (S.D.N.Y.1970); Jefferson Lake Sulphur Co. v. Walet, 104 F.Supp. 20, 23 (E. D.La.1952), aff'd, 202 F.2d 433 (5th Cir.), cert. denied, 346 U.S. 820, 74 S.Ct. 35, 98 L.Ed. 346 (1953).

35. 15 U.S.C. § 78p(b) (1970). *Cf.* Booth v. Varian Associates, 334 F.2d 1 (1st Cir. 1964), cert. denied, 379 U.S. 961, 85 S.Ct. 651, 13 L.Ed.2d 556 (1965); Rheem Mfg. Co. v. Rheem, 295 F.2d 473 (9th Cir. 1961).

amount of profits in each transaction which the plaintiff is entitled to recover.

1. On or about August 1, 1969, the defendant purchased 2,200 shares (previously discussed) at a cost of $40,756, and received for an equivalent number upon the sale $30 a share or a total of $66,000, realizing a profit of $25,244.

2. On November 15, 1959, he purchased 1,350 shares at a cost of $25,650, and received for an equivalent number $30 a share, realizing a profit of $14,850.

3. On November 25, 1969, he purchased 400 shares at a cost of $7,500, and received for an equivalent number $12,000, realizing a profit of $4,500.

■ 4. This transaction centers about 880 shares which the defendant acquired from his former son-in-law in September 1969. At that time the son-in-law and daughter were involved in divorce negotiations. The defendant testified that in 1966 or 1967 he had given the son-in-law shares of Odell, but in view of the contemplated divorce did not want him to retain them. Accordingly, in September 1969, he repurchased the shares, which were included in the sale to Papercraft. He paid the son-in-law $15,000. The defendant, however, contends that the acquisition of the shares was part of an overall settlement whereby he also cancelled certain debts allegedly due from the son-in-law, which included sums he had previously borrowed as well as moneys he had given to his daughter which the son-in-law allegedly had appropriated to his own use. The defendant's testimony on this subject was vague and conflicting; details were lacking; no note or other documentary evidence supports his claim. No proof was submitted as to the existence of any debt owing from the son-in-law to the

defendant.[36] The record justifies a finding that the defendant purchased 880 shares in September 1969 for $15,000 and resold them several months later to Papercraft for a total of $26,400; accordingly, he is required to surrender the $11,400 profit derived from this transaction.

■ 5. Plaintiff also seeks recovery of profits on an additional 510 shares that were registered in the names of persons other than defendant, and which were sold to Papercraft. That those shares were so registered does not, by itself, permit the inference they were purchased by defendant within the six-month period from the persons in whose names they were registered. Indeed, with respect to specific shares contained within that group, the defendant testified he had acquired them long before the six-month period and that some were "laying in my vault for many years." The plaintiff made no attempt to examine any of the individuals in whose name the shares had been registered to contradict the defendant's testimony or raise any issue with respect thereto. The defendant's version is not implausible and there is no basis upon which to reject his testimony. The burden of proof was upon the plaintiff to show that these shares came within the six-month proscription and he failed to carry his burden. Accordingly, plaintiff is entitled to recover only upon items 1 through 4 above, a total of $55,994.

■ The defendant urges that the judgment not carry interest, based "on considerations of fairness and equity," principally because of a fourteen-month delay in the commencement of suit by plaintiff.[37] However, despite the multiple defenses advanced by defendant in resisting the return of profits realized,

36. *Cf.* Dyer v. MacDougall, 201 F.2d 265 (2d Cir. 1952).

37. *See* Lewis v. Wells, 325 F.Supp. 382, 387 (S.D.N.Y.1971) (interest denied where insiders promptly attempted in good faith to compromise the 16(b) claim against them). *See also* Blau v. Lehman, 368 U.S. 403, 414,

82 S.Ct. 451, 7 L.Ed.2d 403 (1962); Blau v. Lamb, 363 F.2d 507, 528 (2d Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967); Newmark v. RKO General, Inc., 305 F.Supp. 310, 316–317 (S.D.N.Y.1969), aff'd, 425 F.2d 348 (2d Cir.), cert. denied, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970).

none of them, as discussed herein, are of substance. The corporation should have had those funds soon after demand was made upon defendant, certainly by the time suit for their recovery was commenced. To permit an insider to hold on to profits for an inordinate period while litigation is carried on would place a premium on delay. The courts have been consistent in the view that the most effective way to enforce section 16(b) is a rigid rule taking all the profits out of any transaction which comes within its proscription. Accordingly, the judgment to be entered herein shall bear interest from the date of commencement of suit.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law. Judgment shall be entered accordingly.