C.R.A. REALTY CORP.,
Plaintiff–Appellant,

v.

FREMONT GENERAL CORP.; Lee
Emerson McIntyre, Defendants–
Appellees.

No. 92–55407.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 2, 1993.

Decided Sept. 28, 1993.

David Lopez, Southampton, NY, for plaintiff-appellant.

Robert E. Willett and Lauren M. Yu, O'Melveny & Myers, Los Angeles, CA, for defendants-appellees.

Before NOONAN, FERNANDEZ and KLEINFELD, Circuit Judges.

NOONAN, Circuit Judge:

C.R.A. Realty Corp. (C.R.A.) brought a stockholder's suit for the recovery of short-swing profits under § 16(b) of the Securities Exchange Act, 15 U.S.C. § 78p(b), against Fremont General Corp. (Fremont) and Lee Emerson McIntyre (McIntyre). The precise issue before the district court was one of first impression. That court gave judgment for McIntyre. We reverse and direct that judgment be entered for the plaintiff.

*FACTS*

Fremont has issued 8,296,929 shares of common stock. McIntyre and his wife were co-settlors, and McIntyre the sole trustee, of an inter vivos trust of which he and his wife were joint life income beneficiaries with power to invade the corpus. As of January 1,

1991, the trust owned 1,400,000 shares of Fremont. McIntyre, therefore, was the beneficial owner of more than 10 percent of the stock of Fremont, whose securities were registered under the Securities Exchange Act of 1934, 15 U.S.C. § 78*l* (g). As such, McIntyre was subject to § 16(b)'s prohibition of short-swing insider trading of Fremont's stock.

On February 18, 1988 McIntyre and his wife through the L.E. McIntyre & Co. partnership loaned their son David $2 million, in return for which David executed a demand note and pledged 198,187 shares of Fremont.

In December 1989 David McIntyre's employment was terminated by Fremont, and he desired to sell all his stock in the company. On January 4, 1990 an agreement was made between him and his father's partnership by which he agreed to sell the 198,187 shares of Fremont to the partnership for a price of $19.835 per share or a total of $3,931,039.15. The larger portion of this amount was allocated by the agreement to the payment of the outstanding loan plus interest. In the nearly two years that had elapsed since the making of the loan, the value of the Fremont stock had risen, so in order to satisfy the preexisting debt of the son to the father, the son needed to sell only 141,193 shares. The remaining 56,694 shares were not acquired by McIntyre in satisfaction of any preexisting debt. The partnership agreed to pay the residue of the purchase price of $1,124,525.49 by a negotiable promissory note.

On March 28, 1990 McIntyre, through the partnership, sold 70,000 shares of Fremont on the open market. The price was $20.75.

## PROCEEDINGS

On April 13, 1990 C.R.A., a stockholder in Fremont, made demand upon Fremont to recover the short-swing profit allegedly made by McIntyre on the sale. Sixty days expired and Fremont did not respond. C.R.A. began this suit in the United States District Court for the Southern District of New York. By agreement of the parties it was discontinued without prejudice and reinstituted in the Central District of California.

Both parties moved for summary judgment. The district court found that the facts were not in dispute and that the shares received to retire the debt were clearly exempt from § 16(b) under the explicit provision of that statute exempting a security "acquired in good faith in connection with a debt previously contracted." The district court noted there was no precedent "in which the statutory insider acquired shares in part from the cancellation of the debt and in part for additional consideration." The court concluded that the transaction as a whole "did not clearly fall within or outside the purview" of § 16(b). The court then observed that the transaction did not seem to present "even the potential for abuse of insider information." The court treated the situation as one in which the loan was "over-collateralized." It concluded that McIntyre should not be penalized because of this fact and all of the stock sold should be treated as exempt. The court granted summary judgment in his favor.

C.R.A. appeals.

## ANALYSIS

■ The literal language of § 16(b) applies to the sale of the 56,694 shares that are the subject of this appeal. That number of shares was acquired by McIntyre by purchase on January 4, 1990 and that number of shares was not within the preexisting debt exemption when McIntyre sold 70,000 shares on March 28, 1990. The statute is peremptory in prescribing that "any profit realized" by a beneficial owner "from any purchase and sale" within "any period of less than six months" shall inure to the benefit of the issuer. 15 U.S.C. § 78p(b).

The statute has been glossed as not applying in the case of a purchase by a beneficial owner followed by a merger of the issuer effecting the disposition of its shares within the prohibited period. *Kern County Land Co. v. Occidental Corp.*, 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973). The Court recognized that such a situation was not an ordinary purchase and sale; in the jargon now current, it was an "unorthodox" transaction. *Id.* at 593, 93 S.Ct. at 1744. As the beneficial owner did not bring about the transaction by which its shares were dis-

posed of, the Court was unwilling to construe the involuntary exchange at the time of merger as a "sale" within the meaning of § 16(b). *Id.* at 596, 93 S.Ct. at 1745.

It was in the spirit of *Kern County* that the district court interpreted § 16(b) in this case not to include the disposition of any of the shares acquired. The difficulty with this approach is that McIntyre acquired stock to settle the debt, and he acquired additional stock. McIntyre bought and sold on his own volition. There was nothing involuntary about either his purchase or his sale. *Kern County* has no application. *Colan v. Mesa Petroleum Co.,* 951 F.2d 1512, 1522–1523 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992).

▆▆▆ The original loan may have been "over-collateralized," but at the time of the settlement the shares necessary to settle the debt were agreed by both parties to be less than the shares McIntyre agreed to purchase. These additional shares do not fit within the statutory exemption. True, the exemption has a certain vagueness, speaking of shares "acquired in good faith in connection with a debt previously contracted," a phrase slightly broader than in direct discharge of a debt. *Rheem Manufacturing Co. v. Rheem,* 295 F.2d 473, 476 (9th Cir.1961). But the shares acquired must have a relation to the debt discharged. *Id.* Here is not a case where a lender obtained a security interest in shares worth more than the amount of a loan, then sold them when the debtor defaulted, making a profit because the sales proceeds exceeded the amount loaned plus interest. In the case before us, the agreement for purchase and sale of the stock, and the deposition testimony, demonstrated, and the parties agree, that in January 1990, L.E. McIntyre & Company acquired 141,493 shares in connection with the earlier loan as an offset against it, and an additional 56,694 shares for cash and a note. No contention is made that the 56,594 shares was acquired as security for the loan. The parties agree that 56,694 shares are not covered by the loan exemption, and 141,493 shares are. McIntyre's argument is that since he owned 141,-493 exempt shares, and only sold 70,000

shares within six months of acquisition, the exemption should apply to the sale.

Here, McIntyre's good faith is not challenged. But we cannot construe the exemption as broadly as the district court did. The crux of the matter is that the *potential* for abuse of insider information was present. An insider could have known that Fremont stock was likely to go up and have wanted to acquire more stock to sell on the rise. Good faith in buying does not insulate McIntyre when he bought and sold within the forbidden period. .

There can be no question of treating McIntyre's sale of 70,000 shares as a sale of only his exempt stock. That procedure is as inadmissible as supposing that he did not sell any of the stock acquired in January 1990 from his son but sold holdings of his own, acquired earlier. To analyze the transaction in that way would be, in effect, to earmark shares of stock and to let an insider decide which shares he was selling. Long ago the mistake in such an analysis was pointed out by Judge Learned Hand, *Gratz v. Claughton,* 187 F.2d 46, 50–51 (2d Cir.1951), *cert. denied,* 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951). Shares of stock are as fungible as bushels of wheat. Because McIntyre purchased 56,694 non-exempt shares and then sold 70,000 shares within six months, he must disgorge his profit on all the non-exempt shares. In calculating the subtrahend and the minuend for purposes of § 16(b) a court must take non-exempt shares acquired within the prohibited six months and subtract their cost from the price of the minuend, the shares sold within the period, and so determine the profits realized, as follows:

| Sales proceeds— | | |
|---|---|---|
| 56,694 shares × $20.75 | | $1,176,400.50 |
| less cost— | | |
| 56,694 shares × $19.835 | | $1,124,525.49 |
| profit on non-exempt shares | | $ 51,875.01 |

This calculation leaves 13,306 shares of the 70,000 sold to be covered by the debt exemption, so, as the parties agree, no profit need be disgorged on those 13,306 shares.

As there is no dispute as to the facts, and as the law is here settled, the judgment is REVERSED and the case is REMANDED

to the district court for entry of judgment in favor of C.R.A. in accordance with this opinion. C.R.A. may apply to the district court for attorney's fees.